# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2002-DR-00932-SCT

*DALE LEO BISHOP*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/04/2000 |
| TRIAL JUDGE: | HON. FRANK A. RUSSELL |
| COURT FROM WHICH APPEALED: | LEE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF CAPITAL POST-CONVICTION COUNSEL |
| | BY:  ROBERT M. RYAN |
| |      LOUWLYNN VANZETTA WILLIAMS |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JUDY T. MARTIN |
| |      MARVIN L. WHITE, JR. |
| DISTRICT ATTORNEY: | JOHN RICHARD YOUNG |
| NATURE OF THE CASE: | CIVIL - DEATH PENALTY - POST CONVICTION |
| DISPOSITION: | LEAVE TO PROCEED IN TRIAL COURT WITH PETITION FOR POST-CONVICTION RELIEF DENIED -  07/01/2004 |

MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**WALLER, PRESIDING JUSTICE, FOR THE COURT:**

¶1.	Dale Leo Bishop was convicted of the crime of capital murder, with the underlying felony of

kidnaping, and sentenced to death.  Bishop's conviction and sentence were affirmed by this Court in

*Bishop v. State*, 812 So.2d 934 (Miss. 2002), *cert. denied*, 537 U.S. 976, 123 S.Ct. 468, 154 L. Ed. 2d 335 (2002).  This Court's mandate issued on April 18, 2002.  Bishop, represented by the Mississippi Office of Capital Post-Conviction Counsel (MOCPCC), has now filed his Motion for Leave to Proceed in the Trial Court with a Petition for Post-Conviction Relief.  The State has filed its response in opposition to the motion.

## FACTS AND PROCEDURAL HISTORY

¶2.    The following statement of facts is taken from this Court's opinion in *Bishop v. State*, 812 So.2d 934 (Miss. 2002):

> FN1. Bishop did not testify at trial. He did give a detailed statement to the police on December 13, 1998, which statement was admitted into evidence.

> About 10:30 p.m. on the evening of December 10, 1998, Gentry, Bishop, Jessie Johnson, Cory Johnson, and Charlie Rakestraw went to Ricky Myhand and Rachel Dobbs's apartment in Saltillo. Jessie, Bishop's co-defendant, and Cory were brothers. After drinking a couple of beers, Jessie decided to go to a store for more beer and asked Myhand to go along. Gentry, who had driven his vehicle to Myhand's apartment, drove Jessie, Bishop and Myhand to the store. Upon reaching their destination, they discovered that the store was closed, so Gentry turned around and headed back toward Myhand's apartment.

> On the way back, Jessie, who was seated in the front passenger seat, asked Gentry why he "narced" or "ratted on" his little brother. [FN2] Gentry denied doing so. Jessie said, "Yeah, you did," then reached down to the floorboard, grabbed a hammer and hit Gentry between the eyes. [FN3] The car coasted to a stop and Gentry begged Jessie not to hit him again. Bishop, who was seated behind Gentry, grabbed Gentry in a headlock and hit him. While he was being held, Jessie struck Gentry in the head again with the hammer. [FN4] Bishop and Jessie next made Gentry move over into the front passenger's seat, and Jessie began driving. He turned off the road and went down a little field road. When Jessie stopped the vehicle, Gentry jumped out of the car and ran. Jessie told Bishop to catch him.

> > FN2. In his statement given to the police, Bishop said Jessie was upset at Gentry for ratting on his brothers. As a result of the "ratting," Bishop believed that Jessie's little brothers were charged with some serious

2

crimes. "Mark [Gentry] had instigated his brothers' getting about 9 or 10 counts of grand larceny and burglary."

FN3. In his statement given to the police, Bishop, whose life-long vocation was being a carpenter, admitted the hammer belonged to him and went into some detail describing its characteristics. He stated that carpenter's hammers normally used in Mississippi weighed 20 to 22 ounces. He stated, "[The hammer owned by Bishop and used to hit Gentry] is a 28 ounce Vaughn [? ? ? not sure if Vaughn is correct] [sic] California framing straight claw." He indicated that his hammer was not available for purchase in Mississippi. When asked by the police about how he came about bringing a hammer with him when he went riding with Gentry, he admitted using a false pretense:

> BY BISHOP: Well, when the trip originally began, the excuse was that I was going to go work on my truck and I use the hammer to work on my truck.
> BY THE POLICE: Is that true?
> BY BISHOP: That's just how we got the usage of the car to begin with.

FN4. There is some discrepancy in the chain of events. In his statement, Bishop indicated that Jessie initially "decked Gentry with his hands." Then Bishop grabbed Gentry and Jessie hit him "probably just twice" with the hammer.

After about five minutes Bishop came back with Gentry and forced him to get on his knees in front of the car. Bishop and Jessie began kicking Gentry. Jessie struck Gentry numerous times with the hammer. At one point Myhand was asked to hold Gentry while Bishop retrieved beers for himself and Jessie. In response, Myhand begged Jessie to stop. When they finished, Bishop had to dislodge the hammer from Gentry's throat, and then he and Jessie drug Gentry into the bushes. While returning to Myhand's apartment, Jessie and Bishop discussed finding a shovel with which to bury Gentry. At Myhand's apartment, Jessie and Bishop washed off and changed into some clean clothes given to them by Myhand.

When Bishop, Jessie, Cory and Rakestraw finally left the apartment, Myhand and Dobbs called the police. Myhand took the officers to the site of the murder, and Gentry's body was recovered. Gentry's car was there, and a shovel was found nearby. Bishop and Jessie apparently fled the scene when the police car pulled up. They hid out in the woods until they were apprehended on December 13, 1998.

3

Steven Hayne, M.D., a forensic pathologist who conducted the autopsy on Gentry's body, testified that there were 23 injuries to the head, neck and hand which were produced either by a blunt object with enough force to break or tear the skin, or with a sharp object such as the edge of a claw hammer. These injuries did not include bruises or scrapes which could have been produced from being kicked. Injuries to the hands, forearms and fingers were consistent with defensive posturing by Gentry. According to Dr. Hayne, "Mr. Gentry died from cranial cerebral trauma, secondary to blunt force trauma to the head, and he also died from lacerations, tears of the voice box, with aspiration of blood."

*Bishop,* 812 So.2d at 937-38.

¶3.     This Court's mandate in Bishop's direct appeal issued on April 18, 2002. The statute of limitations for filing Bishop's application for post-conviction relief expired on April 18, 2003, the date the present post-conviction relief petition was filed. *See **Puckett v. State***, 834 So.2d 676, 677-78 (Miss. 2002). Included with his motion to proceed in the trial court, Bishop also filed a motion to supplement and/or amend the present petition. The State strongly objected. By order entered on May 16, 2003, this Court denied Bishop's motion to supplement or amend the petition. This Court noted that "Bishop . . . offered nothing to support his motion to supplement or amend the application." The order stated, "that absent any compelling reasons or circumstances, the Court intends to follow the prescribed time lines."

¶4.     In his petition, Bishop asserts the following grounds for relief:

I. The Petitioner was denied his Sixth Amendment right to effective assistance of counsel at the guilt and sentencing phases of the trial within the meaning of ***Strickland v. Washington***, and corresponding portions of the Mississippi Constitution.

II. Petitioner's Eighth Amendment rights were violated by the imposition of a sentence of death which was constitutionally defective in light of ***Tison v. Arizona***.

III. The errors and omissions of the trial judge at the sentencing denied Bishop of fundamental constitutional rights as guaranteed under the United States and Mississippi Constitutions.

IV. The trial court erred in charging the trial jury with State requested instruction 10 as the same is an incorrect statement of the law of the State and as a result, Bishop was unfairly prejudiced and denied a fundamentally fair trial.

4

V.  Bishop is mentally retarded as contemplated in the United States Supreme Court case of *Atkins v. Virginia* and the Eighth Amendment forbids the execution of the mentally retarded.

VI.  Introduction of the 911 Audio Tape was in error.

VII. Bishop asserts that his death sentence was disproportionately imposed.

VIII.  Bishop was denied his rights guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments of the Federal Constitution and Mississippi Law due to the cumulative effect of the errors at his capital trial.

¶5.     The State has filed its response in opposition to the petition and Bishop has filed a reply to the

State's response.  The State has also filed a Motion to Strike Exhibits and Appendices to and Portions of

Petitioner's Reply Brief, which will be addressed below.

## ANALYSIS

I.      **Whether Bishop was denied his Sixth Amendment right to effective assistance of counsel at the guilt and sentencing phases of the trial within the meaning of *Strickland v. Washington*, and corresponding portions of the Mississippi Constitution.**[1]

¶6.     This Court has stated the following regarding ineffective assistance of counsel:

The standard for determining if a defendant received effective assistance of counsel is well settled. "The benchmark for judging any claim of ineffectiveness [of counsel] must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." ***Strickland v. Washington***, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). A defendant must demonstrate that his counsel's performance was deficient *and* that the deficiency prejudiced the defense of the case. ***Id.*** at 687, 104 S.Ct. 2052. "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." ***Stringer v. State***, 454 So.2d 468, 477 (Miss. 1984) (citing ***Strickland v. Washington***, 466 U.S.

---

[1]Bishop was represented at trial by David Lee Daniels and John Weddle, both of Tupelo.  David Lee Daniels also represented Bishop during his direct appeal.

at 687, 104 S.Ct. 2052). The focus of the inquiry must be whether counsel's assistance was reasonable considering all the circumstances. *Id.*

*Burns v. State*, 813 So.2d 668, 673 (Miss. 2001) (emphasis in original). Bishop argues that his trial counsels' performance was deficient in four areas: failing to file a motion for change of venue; failure to conduct an adequate and sufficient investigation for purposes of mitigation and their failure to present mitigation evidence constituted ineffective assistance of counsel; failing to present an adequate and sufficient defense in the guilt/innocence phase of the trial; and failing to adequately prepare for trial. Bishop asserts that counsels' performance was so deficient that he suffered prejudice and, but for those deficiencies, it is likely that the outcome would have been different.

### a) Motion for Change of Venue

¶7. Bishop argues that his trial counsel were constitutionally ineffective for failing to file a motion for a change of venue.[2] Bishop asserts that during voir dire numerous jurors responded that they had heard about the case. Bishop contends that his trial counsel's "limited voir dire in open court was insufficient to establish the effect of pre-trial publicity." Bishop also argues that counsel should have sought a continuance in order to assess the pre-trial publicity.

¶8. The State points out that Bishop did not attach any affidavits or any documentation regarding pre-trial publicity to his petition. In his reply to the State's response, Bishop included the affidavit of family

---

[2]It is noteworthy that Jessie Dewayne Johnson's motion for a change of venue was granted. Johnson's trial was held in Tishomingo County and the jury sentenced Johnson to life without parole. *Johnson v. State*, 816 So.2d 436, 437 (Miss. Ct. App. 2002). John Weddle's affidavit states that Johnson went to trial after Bishop and that venue was changed because of the press exposure of Bishop's trial.

members and included newspaper articles and documents of other media coverage.[3] Bishop contends that there was so much pre-trial publicity that it prevented a fair trial.

¶9.    The record reveals that there were approximately eighty prospective jurors in the regular and special jury panels.  The trial judge, the prosecutor and Bishop's trial counsel questioned them at length in voir dire.  Although many of the jurors admitted hearing about the case between the time of the murder and up to the eve of trial, all stated that they could disregard what they had heard, could listen to the evidence, and could be fair and impartial.[4]

¶10.    This Court has held "that defense counsel is under no duty to attempt to transfer venue and, therefore, the decision not to would fall within the realm of strategy. [*Faraga v. State*, 514 So.2d 295, 307 (Miss.1987)] (citing *Murray v. Carrier*, 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986)).  We find that, likewise, the decision to obtain a venue change is within the realm of strategy." *Wilcher v. State*, 863 So.2d 719, 750 (Miss. 2003); *Wilcher v. State*, 863 So.2d 776, 811 (Miss. 2003).  In *Faraga*, every person in the venire had heard of the case.  Faraga argued that, due to pre-trial publicity, his counsel's failure to move for a venue change was ineffective assistance of counsel.  This Court held that

---

[3]The State has filed a motion to strike these documents and others filed with Bishop's reply.  As is discussed more fully below, the Court finds that the motion to strike should be granted.  Included with these documents are excerpts of media coverage aired and/or printed during the course of the trial and after the verdict.  The record reveals that the jury was sequestered in a hotel.  The trial judge had the telephones and televisions removed from their rooms and bailiffs were present when the jurors were allowed to make phone calls or watch TV.  Accordingly, the jurors were not exposed to any publicity during the course of the trial.

[4]In his reply, Bishop states that one juror's "joy" at being seated is clear evidence that a change of venue was necessary.  The record reveals that Bishop has taken what happened completely out of context.  The trial judge had been joking with the prospective jurors regarding their possible selection.  The trial judge then incorrectly called a man "Mrs.," incorrectly named the last juror, and then corrected himself.  It is clear from the record that Juror Gibson was smiling as he was selected because of what had just transpired.

Faraga could not meet either prong of the *Strickland* analysis. *Id.* at 307. *See also Woodward v. State*, 843 So.2d 1, 15-17 (Miss. 2003); *Cabello v. State*, 524 So.2d 313, 316-17 (Miss. 1988); *Wiley v. State*, 517 So.2d 1373, 1378 (Miss. 1988).

> The venire chosen in DeSoto County was thoroughly examined and questioned about whether they had been exposed to any form of publicity. The venire was questioned about their amount of exposure to any of the various forms of publicity. In addition, if any member was exposed, they were also questioned about whether such publicity would influence or affect their impartiality. The linchpin is whether the venire members stated that they could be fair and impartial jurors if chosen. *See King v. State*, 421 So.2d 1009, 1016 (Miss. 1982), *cert. denied,* 461 U.S. 919, 103 S.Ct. 1903 (1983); *Armstrong v. State,* 214 So.2d 589, 593 (Miss. 1968), *cert. denied,* 395 U.S. 965, 89 S.Ct. 2109 (1969). The record reflects that each of the impaneled jury members affirmatively stated that they could serve as fair and impartial jurors.

*Simon v. State*, 688 So.2d 791, 804 (Miss. 1997) (emphasis added).

¶11.     The record in this matter reveals that the jurors stated that they could be fair and impartial. The record also reveals overwhelming evidence of Bishop's guilt. Counsels' performance was not deficient. However, even if it were, Bishop cannot show that such deficiency prejudiced his defense. *Strickland,* 466 U.S. at 691-92, 104 S.Ct. at 2066-67. This issue is without merit.

### b) Counsel's Duty to Investigate and Present Mitigating Evidence

¶12.     Bishop argues that counsels' failure to conduct an adequate and sufficient investigation for purposes of mitigation and their failure to present mitigating evidence resulted in his suffering from the ineffective assistance of counsel. Bishop contends that his trial counsel had a duty to investigate his mental illness and possible mental retardation and to present this mitigating evidence. Bishop alleges that there was an abundance of relevant, significant mitigating evidence which could have been obtained from his family members, but his counsel failed to interview them.

8

¶13.    The record reveals that Bishop instructed his counsel not to oppose the death penalty in the event

of a guilty verdict and waived sentencing by the jury.[5]   On direct appeal, Bishop argued that the trial court

erred in allowing him to waive sentencing by the jury.  This Court thoroughly evaluated that issue on direct

appeal and included, in the opinion, a lengthy colloquy between the trial court, Bishop and his trial counsel.

*Bishop*, 812 So.2d at 944-47.  After the State presented the aggravating factors and circumstances, the

record further reveals the following regarding mitigation evidence:

> THE COURT:  All right.  Anything to be offered at this time by the defendant?
>
> MR. DANIELS:  Your Honor, **in accordance with our client's wishes, we offer nothing in mitigation**.  We do, however, object to all of the aggravating circumstances as cited by the State here today on the grounds that they are in violation of the Mississippi Constitution, the United States Constitution, and deprive Mr. Bishop of the right to due process, equal protection under the laws.  That is the basis of our objection to those -- each of those aggravators.
>
> THE COURT:  Very well.  Mr. Weddle?
>
> MR. WEDDLE:  Your Honor, would the Court, for the record, make an inquiry unto Mr. Bishop as to whether he wishes to offer any mitigating circumstances?
>
> THE COURT:  Mr. Bishop, at this stage of this second phase, **you have the right to offer any anything you desire in mitigation**.  I'll hear from you at this time if you desire to testify.
>
> DEFENDANT BISHOP:  Yes, sir, your Honor.
>
> THE COURT:  Please stand and consider yourself under the oath that's been administered.
>
> DEFENDANT BISHOP:  Can I say something to Mr. Gentry's family?
>
> THE COURT:  I'll give you that opportunity later. Not at this moment.  **You can tell me any mitigating circumstances you desire**.

---

[5]Bishop now contends that his has some mental illness and/or is mentally retarded.  As will be discussed thoroughly in issue V, Bishop has failed to offer sufficient evidence of either a mental illness or mental retardation.  Accordingly, Bishop has failed to show that he lacked the mental capacity to waive the presentation of mitigation evidence.

DEFENDANT BISHOP: No, sir, I do not.

THE COURT: You understand you have the right to do that?

DEFENDANT BISHOP: Yes, sir.

THE COURT: And you understand I'll consider whatever you say?

DEFENDANT BISHOP: **Yes, sir**.

THE COURT: And you don't desire to offer any mitigating facts or circumstances whatsoever?

DEFENDANT BISHOP: **No, sir**.

THE COURT: Very well. The defendant rests?

MR. DANIELS: The defendant rests.

(emphasis added). Finally, after the trial judge read his verdict, he gave Bishop the opportunity to address

the court. Bishop stated the following:

DEFENDANT BISHOP: I just want to say to James there, I'm sorry for what happened to Mark. Mark was my friend. You know, I -- I thought Mark needed his ass kicked. I did. I didn't know Jessie was gonna go all out like that. Mark was a good man. I mean, he was straight up. He was cool. Mark's in heaven right now. I ain't never gonna ask Mark to forgive me for what I did, for my part in it. I ain't never gonna ask God to forgive me. So you ain't got to worry about me ever seeing Mark. I ain't going to heaven; I won't allow it. **For what I did, I deserve to die. I ain't gonna ask this Court to spare my life and let me grow old.** I ain't gonna do it. Your Honor?

THE COURT: Yes, sir?

DEFENDANT BISHOP: These people here, some of them would like to kill me. They can't. They don't have that authority. If they did, they'd be in the same position that I'm in right now. But you do. You've got that authority. I mean, look at them. They would like to see, you know -- their son was killed, you know. I played a part in that. If I hadn't did what I did, Mark would still be here, he'd still be alive right now. **So I'm asking you to do what they can't do, kill me for what I done. I deserve it. I know it. I want you to sentence me to death.** That's it.

THE COURT: Mr. Weddle, anything you need to add?

10

MR. WEDDLE:  Nothing further, your Honor.

THE COURT:  Mr. Daniels?

MR. DANIELS:  No, your Honor.

THE COURT:  Mr. Bishop, I'm gonna grant your wish.

DEFENDANT BISHOP:  Thank you.

(emphasis added).

¶14.    In his petition, Bishop argues that his counsel were deficient in failing to investigate and interview family members.  As pointed out in the State's response, Bishop failed to attach any affidavits in support of his petition.  In his reply, Bishop has included the affidavits of his mother, other family members, and his ex-wife to support his argument.[6]  However, the quantity and quality of possible mitigation evidence is irrelevant based on Bishop's instructions to his defense attorneys.  Bishop's counsel did all that they could, within the limitations placed on them by Bishop.  Witnesses were not called, and mitigation evidence was not presented pursuant to Bishop's specific instructions.  Because defense counsel acted in accord with Bishop's instructions, their performance was not deficient.

¶15.    In evaluating a similar ineffective assistance of counsel claim, the Fifth Circuit held that counsel is not ineffective for failing to present any evidence at the punishment phase, pursuant to his client's instructions.  *Clark v. Johnson*, 227 F.3d 273, 283-84 (5th. Cir. 2000).  In that case, Clark had been convicted of capital murder in Texas.  In his federal habeas corpus proceedings, he argued that his trial counsel's failure to present any evidence during the punishment phase constituted constructive denial of counsel and was presumed prejudicial.  *Id.*  The Fifth Circuit held that

---

[6]As stated in footnote 3, the State's motion to strike the affidavits and documents attached to Bishop's reply is addressed more fully below.

11

> Clark himself testified that he made the decision not to call any witnesses after talking with his attorneys the day before. "'[M]eaningful discussion with one's client' is one of the 'cornerstones of effective assistance of counsel.'"

*Id.* (quoting *Martin v. Maggio*, 711 F.2d 1273, 1280 (5th Cir. 1983)).

¶16. In another case handed down later the same year, the Fifth Circuit reached the same result. In *Dowthitt v. Johnson*, 230 F.3d 733 (5th Cir. 2000), another Texas death penalty case, Dowthitt argued his counsel was ineffective for failing to present mitigation evidence via his family members during the punishment phase of his trial. The Fifth Circuit held

> The state habeas court found that Dowthitt "did not want any of his family testifying on his behalf." Counsel will not be deemed ineffective for following their client's wishes, so long as the client made an informed decision. *See Autry v. McKaskle,* 727 F.2d 358, 361 (5th Cir. 1984) ("By no measure can ... [the defendant] block his lawyer's efforts and later claim the resulting performance was constitutionally deficient.").

230 F.3d at 748.

¶17. The record in this matter is clear. Bishop was thoroughly advised by his defense counsel and the trial court of the consequences of his decision. Bishop blocked his counsels' efforts and cannot not claim deficient performance. *Clark,* 227 F.3d at 284; *Dowthitt*, 230 F.3d at 748. *See also Williams v. State*, 722 So.2d 447, 450 (Miss. 1998). Counsels' performance was not deficient pursuant to *Strickland v. Washington,* 466 U.S. at 688, 104 S.Ct. at 2064-65.

¶18. Bishop additionally argues that counsel was ineffective in failing to perform an adequate investigation, pursuant to *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L. Ed. 2d 471 (2003). Affidavits from Bishop's mother, aunt, brother and ex-wife, all dated after the State filed its response, were included with Bishop's reply. Each of these affiants state that Bishop's trial attorneys either did not speak with them at all or only spoke with them briefly. Each state they would have testified for Bishop and presented mitigating evidence, had they been asked. The State included affidavits from both of Bishop's

trial counsel in its response. In his affidavit, John Weddle stated that he personally interviewed members of Bishop's family, including Bishop's mother and aunt, and was ready to offer mitigating evidence, but Bishop prevented him from doing so. In his affidavit, David Daniels stated the following:

> I conducted investigation into Mr. Bishop's childhood and had witnesses ready to testify to his traumatic and neglected childhood. These witnesses came from the State of Texas for the purpose of testifying on behalf of the Defendant. Further, I had acquired Mr. Bishop's medical records from his previous place of incarceration, which included evidence of mental instability, hallucinations, and depression. Against my advice, Mr. Bishop elected to forego presenting mitigation evidence.

> Mr. Bishop, of average intelligence, was informed by the trial judge that the Court would consider anything Mr. Bishop desired to present in mitigation, yet he remained steadfast in his desire to forego a sentencing hearing, and mitigation presentation.

¶19. This case is clearly distinguishable from the facts in *Wiggins*. Wiggins's background can only be described as horrific. He was starved, neglected, beaten, abused, and raped for most of his childhood, and he had a diminished mental capacity. Despite all of that, Wiggins had no criminal history prior to the murder. *Wiggins*, 123 S.Ct. at 2533, 2537. From the affidavits submitted by Bishop, his childhood was difficult and he had emotional problems, however, his background does not rise to the same level as Wiggins's.

¶20. Bishop "has not submitted sufficient evidence of a breach of the duty of counsel to investigate and present mitigation evidence as described by the United States Supreme Court in *Wiggins v. Smith*." *Simmons v. State*, 869 So.2d 995, 1004 (Miss. 2004). Finally, even if additional mitigation evidence had been discovered, pursuant to Bishop's instructions, it could not be presented during the sentencing phase of the trial. Bishop cannot show that counsels' performance was deficient or that such deficiency prejudiced him. *Strickland* 466 U.S. at 687, 104 S.Ct. at 2064.

### c) Failure to Present a Defense in the Guilt-Innocence Phase of the Trial.

¶21. Bishop argues that his trial counsel failed to present an adequate and sufficient defense during the guilt phase of the trial. Bishop alleges that his counsel failed to call any witnesses and failed to "subject the prosecution's case to meaningful adversarial testing." The State asserts that Bishop has not named any witnesses and has not specified any testimony which might have been offered in his favor. The State argues that this issue must be summarily dismissed because Bishop failed to allege, with specificity, facts showing ineffective assistance of counsel. This Court agrees. Bishop's allegation of ineffective assistance of counsel "lack[s] the 'specificity and detail' required to establish a prima facie showing." *Ford v. State*, 708 So.2d 73, 75 (Miss. 1998) (citing *Smith v. State*, 434 So.2d 212, 219 (Miss. 1983); Miss. Code Ann. §§ 99-39-11(2) and 99-39-9(1)(c)); *Wilcher*, 863 So.2d at 742.

¶22. Additionally, the record reveals that this issue is without merit. The State called all of the eyewitnesses during its case in chief. Bishop's counsel cross-examined most of the State's witnesses at length. There were no other witnesses to call, except Bishop himself, and he had confessed his involvement to the police. Accordingly, counsels' performance was not deficient. Even if it was, Bishop cannot show that his defense was prejudiced by this alleged deficiency. *Strickland,* 466 U.S. at 691-92, 104 S.Ct. at 2066-67. This issue is without merit.

**d) Defense Counsel Failed to Adequately Prepare for Trial.**

¶23. Bishop makes a very brief argument that his counsel failed to adequately prepare for trial. Bishop notes that pretrial motions were not heard until the eve of trial, rendering them untimely. Bishop's allegation of ineffective assistance of counsel "lack[s] the 'specificity and detail' required to establish a prima facie showing." *Ford*, 708 So.2d at 75; *Wilcher*, 863 So.2d at 742.

¶24. Additionally, this Court considered and rejected a related claim in Bishop's direct appeal. Bishop argued that the trial court erred in failing to hold the omnibus hearing at least three days prior to trial. This

Court found that "Bishop has failed to demonstrate any actual prejudice that resulted from the failure of the circuit court to hold a timely omnibus hearing." *Bishop*, 812 So.2d at 939. "If the merits of the underlying issue have been considered and rejected on direct appeal, then the [petitioner] cannot show deficiency or prejudice in counsel[s]' performance with regard to that issue." *Wiley v. State*, 750 So.2d 1193, 1200 (Miss. 1999). Bishop has failed to show that counsels' performance was deficient, or that he was prejudiced. *Strickland* 466 U.S. at 687, 104 S.Ct. at 2064.

II. **Whether Bishop's Eighth Amendment rights were violated by the imposition of a sentence of death which was constitutionally defective in light of *Tison v. Arizona*.**

¶25. The imposition of the death penalty was based on the fact that the victim's death occurred while Bishop was committing a felony (kidnaping). Bishop contends that "Mississippi law holds that anyone who commits a felony during which a killing takes place has contemplated that lethal force would be used and is therefore death eligible," and that this position is unconstitutional. He cites to Miss. Code Ann. § 99-19-101(7) which provides, in pertinent part, as follows:

> (7) In order to return and impose a sentence of death the jury must make a written finding of one or more of the following:
>
> (A) The defendant actually killed;
>
> (B) The defendant attempted to kill;
>
> (C) The defendant intended that a killing take place;
>
> (D) The defendant contemplated that lethal force would be employed.

Bishop also cites a United States Supreme Court case where the Court held that

> [p]articipants in violent felonies like armed robberies can frequently "anticipat[e] [sic] that lethal force . . . might be used . . . in accomplishing the underlying felony." . . . Indeed, the possibility of bloodshed is inherent

15

in the commission of any violent felony and this possibility is generally foreseeable and foreseen . . . .

*Tison v. Arizona*, 481 U.S. 137, 150-51, 107 S. Ct. 1676, 1684, 95 L. Ed. 2d 127 (1987).

Bishop then concludes that merely contemplating that lethal force would be used is insufficient to support the imposition of the death penalty and that it is impermissible to allow the imposition of the death penalty for a felon who contemplated that lethal force would be used in the commission of a crime, but was not a major participant who showed a reckless indifference to the killing.

¶26.    On direct appeal, Bishop argued the same issue, stating that the evidence showed that "he intended only to give Gentry 'a good whooping.'" *Bishop*, 812 So.2d at 948. The Court rejected his contention, stating as follows:

> Bishop, on the other hand, took an active part in Gentry's murder: he provided the weapon used on the victim, kicked the victim, chased the victim down and held him while the lethal blows were being inflicted. It is reasonable to conclude that if one intends to beat someone in the head with an unusually large hammer, that person intends to use lethal force. Furthermore, the length of time between the first blow and the fatal blow indicates that Bishop not only knew that lethal force would be used, but also encouraged the use of lethal force. He also discussed burying the victim after the crime was completed.

*Id.*

¶27.    Bishop was an active participant in Gentry's murder. He knew that the kidnaping was committed in order to teach Gentry a lesson. He held Gentry down while another man hit Gentry in the head with a hammer. The beating lasted long enough for Bishop to finish one beer, to ask another person to hold Gentry, to go to the car to retrieve another, and then come back. When Gentry freed himself and ran, Bishop chased him, caught him and brought him back for the beating to continue. The beating was so severe that it was necessary for Bishop to dislodge the hammer from Gentry's throat.

16

¶28. The same reasoning that the Court used in considering a similar argument applies to Bishop's argument:

> The appellant argues, however, that only 0.5% of robberies result in homicide. Therefore, it cannot be said the robber in every case intended to kill. This may be true, but we think *it overlooks the great danger the aggressor willfully imposes upon his victim. The constituent crime with its hazardous potential is that which the legislature intended to deter by permitting capital punishment if death results from the felonious undertaking.*

***Culberson v. State***, 379 So. 2d 499, 507 (Miss. 1979) (emphasis added).

¶29. It is clear that Bishop (1) was an aggressor; and (2) willfully imposed great danger upon Gentry. Therefore, Bishop cannot be characterized as "felon who contemplated that lethal force would be used in the commission of a crime, but was not a major participant who showed a reckless indifference to the killing." Bishop's actions overwhelmingly show that he evinced a reckless indifference to Gentry's killing. This issue is without merit.

¶30. Bishop additionally argues that the evidence was insufficient to support a finding that he contemplated that lethal force would be used. Bishop made the same argument in his direct appeal, and this Court ruled against him. ***Bishop*** 812 So.2d at 948. Accordingly, this claim is barred by the doctrine of *res judicata* and is barred from relitigation by Miss. Code Ann. § 99-39-21(3); ***Jackson v. State,*** 860 So.2d 653, 660-61 (Miss. 2003) (quoting ***Lockett v. State,*** 614 So.2d 888, 893 (Miss. 1992)).

**III. Whether the errors and omissions of the trial judge at the sentencing denied Bishop of fundamental constitutional rights as guaranteed under the United States and Mississippi Constitutions.**

**a) Waiver of the sentencing jury and the imposition of a sentence of death by the trial court violates Miss. Code Ann. § 99-19-101.**

17

¶31.    Bishop next argues that waiver of the sentencing jury and the imposition of a sentence of death by the trial court violates Miss. Code Ann. § 99-19-101.  The State argues that this claim is barred by the doctrine of res judicata and is barred from relitigation by Miss. Code Ann. § 99-39-21(3).

¶32.    The State is correct, and this claim is procedurally barred.  Bishop made the same argument in his direct appeal, in which this Court found,

> The statute in question does not contain a provision for the waiver of a jury during the sentencing phase of a trial. However, case law and common practice show that the right to a jury during the sentencing phase may be waived. Bishop requested that his right to jury be waived. The sentencing judge did not force Bishop to do so. The judge discussed the matter in detail with Bishop. He made sure that Bishop's choice to waive his right to jury was voluntary and that he was not under the influence of any drugs. He explained to Bishop his right to offer mitigating evidence and what rights would be given up if the motion for waiver was granted. Bishop explicitly waived his right to a jury during the sentencing phase and cannot now complain his decision was error.

*Bishop*, 812 So.2d at 945.  "Rephrasing direct appeal issues for post-conviction purposes will not defeat the procedural bar of *res judicata*.  The Petitioner carries the burden of demonstrating that his claim is not procedurally barred." *Jackson*, 860 So.2d at 660-61; *Lockett*, 614 So.2d at 893.  This issue is procedurally barred and without merit.

### b)    Waiver of the Sentencing Jury was not Knowingly and Intelligently Made.

¶33.    Bishop argues that the trial judge failed to advise him of the possible sentences the trial judge could impose.  Bishop asserts that the trial judge never informed him of the minimum and maximum sentences that could be imposed by the trial court.  Bishop contends that trial court only told him of the options available to a jury.  Bishop asserts that there is nothing in the record to show that he was aware that the trial court

alone could sentence him to death. Bishop concludes that his waiver was not knowing, intelligent and voluntary.[7]

¶34. The State points out that this issue was capable of determination at trial or on direct appeal and is procedurally barred. Miss. Code Ann. § 99-39-21(1); *Wiley v. State*, 750 So.2d at 1208 (citing *Foster v. State*, 687 So.2d 1124 (Miss. 1996)); *Jackson*, 860 So.2d at 661. Without waiving the procedural bar, the record clearly contradicts Bishop's assertions. Bishop understood that the trial court could sentence him to death and in fact requested that the trial court do so. As is quoted in more detail above in issue I(b), when Bishop was given an opportunity to address the court before sentencing he told the trial judge "I want you to sentence me to death."

¶35. The record clearly shows that the trial judge and Bishop's defense counsel fully advised him of the consequences of his decision. He was explained the sentencing options and he stated that he understood them. The trial judge specifically asked him,

> BY THE COURT: Are you, as you've indicated in this written document, are you knowingly, freely, voluntarily, and understandingly waiving your right to a jury trial at the sentencing phase of the proceeding?
>
> BY MR. BISHOP: Yes, sir.

This issue is without merit.

**IV.   Whether the trial court erred in charging the trial jury with State requested instruction 10 as the same is an incorrect**

---

[7]In his reply, Bishop argues that "given his mental history and capacity at the time of the trial he should not have been allowed to make such decisions." He cites to an MOCPCC staff member's affidavit regarding things he told a MOCPCC attorney in an interview as support for this assertion. As will be more fully discussed in issue V, Bishop has failed to offer sufficient evidence of either a mental illness or mental retardation. Accordingly, Bishop has failed to show that he lacked the mental capacity to waive the presentation of mitigation evidence. As stated in footnote 3, the State's motion to strike the affidavits and documents attached to Bishop's reply is addressed more fully below.

**statement of the law of the State and as a result, Bishop was
unfairly prejudiced and denied a fundamentally fair trial.**

¶36. Bishop argues that jury instruction 10 regarding aiding and abetting was plain reversible error and contrary to the law of Mississippi. Bishop argues that this error is of constitutional dimension and that he has been denied his rights to due process and a fundamentally fair trial. He contends that his conviction and sentence should be vacated.

¶37. The State correctly points out that this Court thoroughly considered and rejected this issue in Bishop's direct appeal. *Bishop*, 812 So.2d at 942-44. This Court first pointed out that Bishop failed to raise the specific objection at trial and that the issue was procedurally barred. Notwithstanding the procedural bar, this Court held,

> Jury Instruction 10, on aiding and abetting, when read with the other instructions which required the jury to find the State had to prove all elements of the offense before Bishop could be found guilty, was harmless error.

*Id.* at 944. Accordingly, this claim is barred by the doctrine of res judicata and is barred from relitigation by Miss. Code Ann. § 99-39-21(3); *Jackson,* 860 So.2d at 660-61; *Lockett,* 614 So.2d at 893.

¶38. Bishop next argues that appellate *harmless error review* was necessary because the error affects a fundamental right. Bishop's argument fails to overcome the procedural bar. This Court is well aware of the holding in *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L. Ed. 2d 705 (1967), and its implications for harmless error analysis. *See Jasper v. State*, 871 So.2d 729, 731-32 (Miss. 2004); *Kolberg v. State*, 829 So.2d 29, 48-49 (Miss. 2002); *Butler v. State*, 217 So.2d 3, 6 (Miss. 1968). This Court's holding regarding jury instruction 10 was issued with complete and full knowledge of

the ramifications of the "harmless error" terminology.[8]   There is no requirement that this Court cite

*Chapman* every time it declares that an error is harmless.  This issue is procedurally barred and without

merit.

> **V.     Whether Bishop is mentally retarded as contemplated in the
> United States Supreme Court case of *Atkins v. Virginia* and
> the Eighth Amendment forbids the execution of the mentally
> retarded.**

¶39.    Bishop asserts that he is mentally retarded and that under *Atkins v. Virginia*, 536 U.S. 304, 122

S.Ct. 2242, 153 L. Ed. 2d 335 (2002), his death sentence is barred as prohibited by the Eighth

Amendment of the United States Constitution.  Bishop attaches copies of his school records to his petition,

in support of his assertion.  He also attaches affidavits of family members to his reply brief.[9]   Bishop alleges

that he has stated a prima facie claim of mental retardation showing "[d]eficiencies in at least two or more

adaptive skill areas."  Bishop, therefore, claims that he is at least entitled to a new sentencing hearing. The

State argues that Bishop is of average intelligence and is clearly not retarded.

¶40.    This Court finds that the proof in this record does not support Bishop's claim of being mentally

retarded as to require remand to the trial court for an *Atkins* hearing.  *Scott v. State*, 1999-DR-00317,

2004 WL 1277027 *10 (Miss. 2004).  At the time of Bishop's trial in February, 2000, there existed no

constitutional prohibition from executing mentally retarded criminals.  A few months after Bishop's direct

appeal was decided by this Court, the United States Supreme Court handed down *Atkins v. Virginia*,

---

[8]Bishop, represented by David Daniels, raised the *Chapman* "appellate harmless error" argument in his motion for rehearing.  This Court denied rehearing on April 11, 2002.  The State also asserts that Bishop raised this issue in his petition for writ of certiorari to the U.S. Supreme Court, which was also denied.

[9]As has been stated supra, the State's motion to strike these documents is addressed below.

21

536 U.S. 304, 122 S.Ct. 2242 (2002), which held that execution of mentally retarded criminals violates the Eighth Amendment to the United States Constitution.

¶41. This Court recently handed down *Chase v. State*, 2003-DR-01335, 2004 WL 1118688 (Miss. 2004) which defines the criteria and procedure to be used both in applying for, and conducting, a hearing for a determination of mental retardation in accordance with *Atkins*. Pursuant to *Chase*, post-conviction relief applicants must provide "an affidavit from at least one expert . . . who opines, to a reasonable degree of certainty, that: (1) the defendant has a combined Intelligence Quotient ("IQ") of 75 or below; and (2) in the opinion of the expert, there is a reasonable basis to believe that, upon further testing, the defendant will be found to be mentally retarded, as defined [in the *Chase* opinion]." *Scott* at *10 (quoting *Chase* at *14).

¶42. "For direct appeals and applications for post-conviction relief which were already pending before this Court at the time *Chase* was handed down, we have ordered a *Chase* hearing without requiring an affidavit, where the record before us reflected a qualified opinion that the defendant was mentally retarded." *Scott* at *10. However, as stated above, Bishop supports his claim with copies of school records and affidavits of family members, none of which are sufficient to satisfy this requirement. Bishop has not established that he is entitled to a *Chase* hearing. "However, should [Bishop] provide the appropriate affidavit which complies with the requirements set forth in *Chase* as an attachment to an application for post conviction relief, pursuant to the Mississippi Uniform Post-Conviction Collateral Relief Act, Miss. Code Ann. §§ 99-39-1 *et seq.,* he could be entitled to a hearing as provided in *Chase*." *Scott* at 11. Since there is insufficient evidence in this record that Bishop is mentally retarded, this issue is without merit.

**VI. Introduction of the 911 Audio Tape.**

22

¶43. Bishop argues that the introduction of the 911 tape into evidence was error. Bishop argues that the proper foundation was not followed prior to the introduction of the tape. Bishop also argues that he was denied his right to confront and cross-examine the sheriff's department employee who had first-hand knowledge of the recording and copying of the tape. The State correctly argues that this issue on was capable of determination at trial or on direct appeal and that it is procedurally barred. Miss. Code. Ann. § 99-39-21(1).

¶44. The record reflects that shortly after the murder Rachel Dobbs called 911 to report the murder. Ricky Myhand was with her and told her what to say to the 911 operator. After Dobbs testified, the tape was admitted into evidence during the testimony of the police officer who had retrieved it from the 911 office. It is clear from the record that the testifying police office did not have direct knowledge regarding the recording of the call or the copying of the tape. At trial Bishop's counsel objected to the admission of the tape because it was hearsay and the State failed to lay a proper foundation. That objection was erroneously overruled.

¶45. However, Bishop cannot overcome the procedural bar. Miss. Code. Ann. § 99-39-21 provides in pertinent part,

> (1) Failure by a prisoner to raise objections, defenses, claims, questions, issues or errors either in fact or law which were capable of determination at trial and/or on direct appeal, regardless of whether such are based on the laws and the Constitution of the state of Mississippi or of the United States, shall constitute a waiver thereof and shall be procedurally barred, but the court may upon a showing of cause and actual prejudice grant relief from the waiver.
> . . . .
>
> (4) The term "cause" as used in this section shall be defined and limited to those cases where the legal foundation upon which the claim for relief is based could not have been discovered with reasonable diligence at the time of trial or direct appeal.

(5) The term "actual prejudice" as used in this section shall be defined and limited to those errors which would have actually adversely affected the ultimate outcome of the conviction or sentence.

(6) The burden is upon the prisoner to allege in his motion such facts as are necessary to demonstrate that his claims are not procedurally barred under this section.

Bishop cannot show cause and actual prejudice. Both Dobbs and Myhand testified during the trial regarding calling 911 and what they told the 911 operator. The tape of the 911 call was cumulative of their testimony. This issue is procedurally barred. Bishop has not been prejudiced, and he cannot overcome the procedural bar. Accordingly, Bishop is not entitled to relief on this issue.

### VII. Whether Bishop's death sentence was disproportionately imposed.

¶46. Bishop contends that the death penalty was disproportionately imposed because his co-defendant, who committed the acts which killed Gentry (beating him in the head with a hammer), received a life sentence. He also makes other arguments, all of which are addressed above.

¶47. The Court addressed the difference in the two sentences on direct appeal:

> The United States Supreme Court required that the imposition of the death penalty be consistent with the Eighth and Fourteenth Amendments to the United States Constitution. The death penalty cannot be given to an aider and abettor who has not killed, attempted to kill, or contemplated that life would be taken.
>
> The record shows that, after Gentry had been hit in the head with the hammer for the first time, Bishop chased after him and brought him back. When Bishop saw Gentry hit with the hammer he knew deadly force was being used. When he ran Gentry down and held Gentry as he was being struck by Jessie, he became more of a principal in the crime. A jury could have easily found that Bishop killed, intended to kill, or at least contemplated that deadly force would be used. This case is not like a robbery where someone is killed on impulse. Bishop took an active role in the killing.

24

> All of these facts show that Bishop's involvement was sufficient to justify the death sentence, even, assuming arguendo, that the actual killer did not receive the death sentence.

*Bishop*, 812 So. 2d at 948-49.

¶48.    This issue was decided on direct appeal against Bishop.  Accordingly, this claim is procedurally barred and cannot be relitigated on post-conviction review.  Miss. Code Ann. § 99-39-21(3); *Walker v. State*, 863 So.2d at 28-9 (citing *Wiley*, 750 So.2d at 1200; *Foster*, 687 So.2d 1124; *Wiley*, 517 So.2d at 1377).  In addition to the procedural bar, it is worthwhile to note that the same issue has been addressed by this Court:

> The appellant's last assignment of error is based on the argument that the rendering of the death penalty for a murder he did not commit nor attempt to commit, nor intended to commit, is inconsistent with the Eighth and Fourteenth Amendments of the United States Constitution. The appellant's argument is based on the recent United States Supreme Court decision of *Enmund v. Florida*, 431 U.S. ----, 102 S.Ct. 3368, (1982) wherein the Court held that the death penalty may not be imposed upon a "non-triggerman" unless there is proof that the defendant killed, attempted to kill, or intended to kill the victim.  In *Enmund*, the Court reversed a decision of the Florida Supreme Court which upheld the death penalty for Enmund who had been indicted for the first degree murder and robbery of an elderly couple who were known to carry large amounts of cash.
>
> * * *
>
> However, we find that the case sub judice does not fall within the holding of *Enmund*. Enmund did not participate in the actual robbery nor was he present when the murder was committed -- he was waiting in the getaway car. Michael Leatherwood, like Enmund, participated in the planning of the crime.  The difference is that Leatherwood was also present and involved in the execution of the robbery/murder of Albert Taylor by throwing a rope over his head and pulling it tight with such force that the victim was jerked into the backseat. Leatherwood held the rope tight and told Tokman to "stab him" even as the victim was being subdued.
>
> Though Leatherwood testified he never believed the robbery would be carried out and certainly never intended to kill the victim, this Court cannot

believe that one who attempts to strangle his victim into submission to the point of unconsciousness and tells his accomplice to "stab him" does not intend to or attempt to kill. The appellant's actions spoke louder than his words.

Though Michael Leatherwood was not the "triggerman", he planned, schemed, and ultimately physically subdued the victim by choking him with a rope, while another stabbed and bludgeoned the victim to death. These are hardly the facts upon which *Enmund* was decided by the United States Supreme Court and thus we find that the appellant's argument is not persuasive, and we find no merit in this assignment of error.

*Leatherwood v. State*, 435 So. 2d 645, 655-57 (Miss. 1983). There is absolutely no difference between Leatherwood's actions and Bishop's actions, and the imposition of the death penalty upon Bishop is not disproportionate in any way. This issue is procedurally barred and without merit.

> **VIII. Whether Bishop was denied his rights guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments of the Federal Constitution and Mississippi Law due to the cumulative effect of the errors at his capital trial.**

¶49. Bishop argues that the cumulative effect of the errors in his trial entitle him to post-conviction relief. None of the claims raised by Bishop warrant post-conviction relief. After a thorough review of the entire trial, and "[a]s previously discussed under the individual propositions, no reversible error was committed in the trial of this case." *Foster v. State*, 639 So.2d 1263, 1303 (Miss. 1994). Bishop is not entitled to any relief on this claim.

### STATE'S MOTION TO STRIKE PORTIONS OF REPLY BRIEF

¶50. The State has filed a Motion to Strike Exhibits and Appendices to, and Portions of, Petitioner's Reply Brief. The State argues that Bishop has raised a new legal issue for the first time in the reply brief and requests that the argument be stricken. The State also contends that Exhibits attached to the reply brief and the documents included in the Appendix, filed with the reply brief, were all available to Bishop at the

26

time he filed his original PCR petition. The State argues that Bishop has filed these documents and asserted the related arguments in an attempt to circumvent this Court's May 16, 2003, order and the statute of limitations. The State moves to strike the new legal issues raised for the first time in the reply. The State also moves to strike all of the exhibits and appendices attached to the reply brief and the arguments related thereto. MOCPCC argues that "Petitioner supplied additional documentation and additional case law to strengthen his position" as rebuttal to the State's Response.

¶51. The State moves to strike paragraph 187 in Bishop's reply brief. The State contends that this paragraph contains a new legal issue raised for the first time in the reply. The State asserts that Bishop is attempting to recast barred issues as a question of ineffective assistance of counsel. The subject paragraph is included in the opening of the reply brief. Before addressing each numbered issue, Bishop makes general arguments that the procedural bars do not apply. He then states:

> 187. Further, Petitioner's claims are not barred because trial and appeal counsel was [sic] ineffective in bringing such claims and objections to the court. The United States Supreme Court has held that such failures are prejudicial especially when the information is available but counsel fails to present such evidence. *Wiggins v. Smith*, 539 U.S. ___; 123 S.Ct. 2527 (2003).

This Court has consistently held,

> First, the appellant did not address this point in his initial Appellant's Brief but instead raised it for the first time in his Rebuttal Brief. This Court has not determined if one may so introduce new assignments of error but the Fifth Circuit has, stating, "We will not consider issues raised for the first time in an appellant's reply brief." *U.S. v. Anderson,* 5 F.3d 795 (5th Cir. 1993), *cert. denied, Barnett v. U.S.,* 510 U.S. 1137, 114 S.Ct. 1118, (1994). This is a fitting and obvious rule for this Court to adopt. Appellants cannot be allowed to ambush appellees in their Rebuttal Briefs, thereby denying the appellee an opportunity to respond to the appellant's arguments.

*Sanders v. State*, 678 So.2d 663, 669-70 (Miss. 1996). *See also Dock v. State*, 802 So.2d 1051, 1053 (Miss. 2001). Paragraph 187 raises an ineffective assistance of counsel claim which was not raised

in Bishop's original petition and which was raised for the first time in the reply. Accordingly, the State's motion to strike paragraph 187 is granted.

¶52. Additionally, the issue raised in paragraph 187 is completely without merit. Bishop is argues "**trial and appeal counsel was [sic] ineffective <u>in bringing such claims</u> and objections to the court**." This makes absolutely no sense. Even if this argument contains a typographical error, as has been discussed above, none of the claims raised by Bishop warrant post-conviction relief. If there was no error regarding the "claims and objections," counsels' performance was not deficient. Bishop cannot meet either prong of *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064.

¶53. The State next moves to strike all of the exhibits and appendices filed with the reply brief and all arguments related thereto. The State contends that all of these documents were readily available to Bishop, through the exercise of due diligence, when he filed his original petition. The State argues that, in its response, it clearly demonstrated numerous weaknesses in the petition. The State asserts that Bishop attached the documents to the reply in an attempt to ambush the State with records and affidavits, to which the State has no mechanism to respond.

¶54. The exhibits attached to the reply brief consist of affidavits from Bishop's family and his ex-wife. (Exhibits 8, 9, 10 & 11). There are also four affidavits from MOCPCC staff regarding their interviews with those affiants.[10] (Exhibits 12, 13, 14 & 15). There is also an affidavit from an investigator for MOCPCC

---

[10]In these affidavits MOCPCC staff restate what Bishop's family and his ex-wife stated in their affidavits. "Miss. Code Ann. § 99-39-9(1)(e) allows the petitioner to present affidavits from witnesses who would testify at trial, not hearsay statements allegedly made . . . to a third party." *Smith v. State*, 1999-DR-01394, 2004 WL 1118621 *5 (Miss. 2004). These are not proper affidavits and the Court will not consider them in the post-conviction proceedings. *See also **Neal v. State***, 525 So.2d 1279, 1280 (Miss. 1987).

wherein she states what Bishop told her and an MOCPCC attorney during a telephone interview.[11] (Exhibit 18). The State's response was filed on September 5, 2003. All of the affidavits are dated between September 12, 2003 and September 22, 2003. The remaining two exhibits consist of an uncertified copy of trial counsel's motion for compensation dated February 23, 2000, and an uncertified, undated copy of what appears to be a witness list. (Exhibits 16 & 17). The documents contained in the appendix include transcripts of the television news coverage before and during the trial.[12] (Appendix 1 & 2). The appendix also includes newspaper articles for the same period and the transcripts from 911 calls and police dispatch on the night of the murder. (Appendix 3 & 4). Finally the appendix includes two undated poems allegedly written by Bishop. (Appendix 5). Bishop's reply brief discusses these documents in paragraphs 189, 191, 196, 197, 199, 203, 213, 215, and 224-26.

¶55.    The post-conviction relief statute requires that the petition contain:

(d) A separate statement of the specific facts which are within the personal knowledge of the prisoner and which shall be sworn to by the prisoner.

(e) A specific statement of the facts which are not within the prisoner's personal knowledge. The motion shall state how or by whom said facts will be proven. Affidavits of the witnesses who will testify and copies of documents or records that will be offered shall be attached to the motion. The affidavits of other persons and the copies of documents and records may be excused upon a showing, which shall be specifically detailed in the motion, of good cause why they cannot be obtained. This showing shall state what the prisoner has done to attempt to obtain the affidavits, records and documents, the production of which he requests the court to excuse.

Miss. Code Ann. § 99-39-9(1). This Court has stated,

---

[11]This is not a proper affidavit and will not be considered by the Court. *Smith*, 2004 WL 1118621 at *5; *Neal*, 525 So.2d at 1280. There is no affidavit from Bishop regarding the things asserted. The only thing directly from Bishop is his one-page verification filed with his original petition. The State does not raise any argument regarding waiver of the attorney-client privilege.

[12]There is also one video tape containing some of that coverage.

Notions of notice pleading have no place in post-conviction applications, the very name of which implies that there has been a final judgment of conviction. Respect for the integrity of the judicial process mandates that we require of such applicants a far more substantial and detailed threshold showing, far in excess of that we deem necessary in the case of a plaintiff in a civil action or, for that matter, in the case of the prosecution in a criminal indictment. In this context we understand Section 99-39-9 suggest a regime of sworn, fact pleadings, based upon personal knowledge.

*Neal*, 525 So.2d at 1280. The documents filed with the reply brief fail to meet the pleading requirements of the post-conviction relief statute.

¶56. The MOCPCC was appointed to represent Bishop on February 15, 2002 and the statute of limitations did not run until April 18, 2003. All of the affidavits and documents were readily available to MOCPCC prior to the running of the limitations period. On May 16, 2003, this Court denied the MOCPCC's request for additional time to supplement or amend the petition. MOCPCC is attempting to circumvent this Court's order by including these documents in the reply brief. The State's motion to strike all of the exhibits and appendices attached to the reply brief is granted. Additionally, the State's motion to strike the arguments in the reply brief which reference these documents is also granted.

## CONCLUSION

¶57. The Motion for Leave to Proceed in the Trial Court with a Petition for Post-Conviction Relief is denied. The State's Motion to Strike Exhibits and Appendices to, and Portions of, Petitioner's Reply Brief is granted.

¶58. **LEAVE TO PROCEED IN TRIAL COURT WITH PETITION FOR POST-CONVICTION RELIEF, DENIED.**

**SMITH, C.J., COBB, P.J., EASLEY, CARLSON, GRAVES, DICKINSON AND RANDOLPH, JJ., CONCUR. DIAZ, J., NOT PARTICIPATING.**