938 So.2d 321 (2006)
Gregory Darnell MOFFETT, Appellant
v.
STATE of Mississippi, Appellee.
No. 2004-KA-02419-COA.
Court of Appeals of Mississippi.
September 19, 2006.
*322 Eileen M. Maher, Natchez, attorney for appellant.
*323 Office of the Attorney General by Jose Benjamin Simo, attorney for appellee.
Before MYERS, P.J., IRVING, CHANDLER and ROBERTS, JJ.
CHANDLER, J., for the Court.
¶ 1. An Adams County jury convicted Gregory Darnell Moffett of the murder of his girlfriend, Tantanisha Thomas. The Circuit Court of Adams County sentenced Moffett as a habitual offender to life in the custody of the Mississippi Department of Corrections. Moffett appeals, arguing that (1) reversible error occurred when the prosecutor violated a court order to refrain from opining that Moffett's prior domestic violence convictions indicated a propensity for violence against the victim; (2) the prosecutor's improper examination of a witness requires a new trial; (3) the evidence was insufficient to support the murder conviction; and (4) the verdict was against the overwhelming weight of the evidence. In his reply brief, Moffett makes the additional argument that the cumulative effect of the errors requires reversal.
¶ 2. We find no error and, therefore, affirm Moffett's conviction and sentence.

FACTS
¶ 3. Moffett, Thomas, and their two children lived together in a house (hereinafter, Thomas's house) in Natchez, Mississippi. Thomas was brutally killed in the early morning hours of December 7, 2003. Thomas's body was discovered sometime after daybreak by a neighbor who looked through a window of Thomas's house and observed Thomas lying still. The front and rear doors of the house were locked. A crying child was inside, and the neighbor broke a window to gain access to the interior. When the police arrived, they encountered a bloody crime scene with Thomas's body propped against a couch in the entry of house. Thomas's baby was in the bedroom; her other child was not at home. The crying child was a neighbor's godchild, D.H., who had spent the night at Thomas's house. The police found no signs of a burglary.
¶ 4. The county coroner, Reverend James E. Lee, determined that Thomas had died from several blows to the left forehead inflicted with a claw hammer found next to her body. Lee placed the time of death at around 3:00 a.m. that morning but stated that the actual time of death could be within two hours before or after 3:00 a.m. The state pathologist, Dr. Stephen Hayne, deferred to Lee's estimate of the time of death. There was no evidence that Thomas had been sexually assaulted. The claw hammer was tested for fingerprints, but none were recovered.
¶ 5. In June 2004, Moffett was indicted for Thomas's murder. The trial occurred on November 16-18, 2004. At the trial, two of Moffett's prior convictions for domestic violence against Thomas, one on September 9, 2003, and one on October 8, 2003, were introduced into evidence. Also admitted was Moffett's November 29, 2003, charge for domestic violence against Thomas that had been dropped due to Thomas's death. Moffett testified that he would have pled guilty to this charge because he had committed the charged conduct. A jailer and a detention officer both testified that Thomas had refused to bail Moffett out of jail after the November 29, 2003 charge. The detention officer heard Moffett tell Thomas on the phone that she had better get him out or he would "beat her a ." The jailer heard Moffett state, "She knows what I will do." Both witnesses overheard Moffett state, "When I get out of here, I'm going to kill that b____."
¶ 6. The following evidence was presented about the chronology of events on the *324 night of December 6, 2003, and the morning of December 7, 2003. Bobbie Woods had lived next door to Moffett and Thomas and was friends with Thomas. Woods had prior convictions for shoplifting and giving false information to the police. Woods testified that, on the evening of December 6, 2003, her fifteen-year-old son, Damien Davis, had gone to Thomas's house to keep Thomas company because Thomas was afraid of Moffett. Thomas had babysat D.H. that day and Woods gave D.H. permission to spend the night at Thomas's house. At approximately 11:30 p.m., Moffett and Thomas visited Wood's house. Moffett and Thomas were arguing during the visit and Thomas stated, "Bobbie, tell Greg that I'm not cheating on him." Thomas was upset and did not want to leave, but Moffett kept urging her to go.
¶ 7. After several minutes, Moffett and Thomas returned to Thomas's house. Woods called Thomas several times and asked her to send Davis home; once, Moffett answered the phone. Woods stated that Davis did not return from Thomas's house until 2:15 a.m. Very shortly thereafter, Thomas called and asked Davis to come back, and Davis said he would. Telephone records admitted into evidence established that this call occurred at 2:16 a.m. However, Davis fell asleep and did not return to Thomas's house that night. Woods called Thomas at 2:49 a.m., but there was no answer. Phone records showed that no incoming calls to Thomas's house were answered until after the police arrived.
¶ 8. Davis testified that he went to Thomas's house at Thomas's request at 7:00 p.m. on December 6, 2003. Davis said that he did not leave the premises until 2:15 a.m. on December 7, 2003. He played video games most of the time he was there. He witnessed Moffett and Thomas arguing throughout the night. Moffett kept telling Thomas that he was going to kill her. Moffett told her that he would "put her family in black" and that "they might as well go on and get their black dress ready." Moffett told Thomas that she would need a bat, and then handed her one. Woods called, but Moffett stood beside the phone and prevented Thomas from talking to Woods. Moffett kept urging Davis to leave, but Thomas asked Davis to stay. Davis stayed because he could see that Thomas was frightened. Later, Davis observed that Moffett had changed into black clothes and shoes. Davis stated that Moffett called someone named Mike Freeman. Moffett told Freeman that he had "some business to take care of." Then, Moffett asked Davis to leave so that he and Thomas could take a bath together. Davis refused to leave. Thomas ran a bath. During the night, Woods repeatedly phoned for Davis to come home and he did so at 2:15 a.m. Shortly thereafter, Thomas called him and asked him to return. Davis said that he would return, but he accidentally fell asleep. Davis said that Moffett did not leave Thomas's house the entire time Davis was there, except when Moffett and Thomas briefly went to Woods's house.
¶ 9. Another neighbor, Rosie Williams, testified that she saw Moffett and Thomas arguing in their driveway sometime after midnight. Carolyn Harris testified that she lived at Brumfield Apartments and that Moffett visited her apartment at about 4:30 a.m. on December 7, 2003. Moffett used the phone and Harris overheard Moffett saying, "Don't tell anyone where I am." Moffett left after 10:30 a.m. and said that he was going to Baton Rouge. Officer Gary Nations of the Natchez Police Department testified that the witnesses who saw Moffett that morning reported that he was wearing all black.
*325 ¶ 10. Officer Todd Ainsworth of the Concordia Parish Sheriff's Department testified that he apprehended Moffett at a Quickstop convenience store outside of Ferriday, Louisiana at 4:50 a.m. on December 10, 2003. Moffett had been outside the Quickstop, shaking the door and demanding to be allowed inside. Moffett told Officer Ainsworth that he had been out hunting all night and had been dropped off by friends. Moffett produced no hunting license or other identification and would not identify himself. He had been outside in the rain for several hours.
¶ 11. Moffett gave a statement to Officer Nations. He said that, on December 6, 2003, he left Thomas's house between 9 and 10 p.m. and went to Lewanda Smith's house. While there, he called Thomas. He returned home before 12:00 a.m. Between 12:00 a.m. and 1:00 a.m., Ronnie Jones picked him up from Thomas's house. He and Jones drove around together, once stopping at Zippy's convenience store. At about 3:00 a.m. Jones dropped Moffett off at Brumfield Apartments. From there, Moffett went to Club Paradise and to Queen's Lounge. He returned to Brumfield Apartments at about 5:00 a.m. and went to Harris's apartment. While there, Moffett fell asleep and was awakened by his pager. Sheila Letcher had paged him. He returned the call and Letcher told him Thomas had been found dead. Moffett fled.
¶ 12. Moffett's chronology of events at the trial differed from that in his statement to the police. Moffett denied that he killed Thomas. He testified that Smith picked him up about 10:00 p.m. They went to Zippy's and then to Smith's apartment, where Thomas paged Moffett three times and Moffett returned each call. Indeed, the phone records showed calls to Moffett's pager from Thomas's house at 10:49 p.m., 11:00 p.m., and 11:18 p.m., and calls from Smith's house to Thomas's house at 10:53 p.m., 11:01 p.m., and 11:20 p.m. Moffett testified that he returned home at approximately midnight. Davis was not there. Moffett testified that Davis was not at the house the entire evening, but traveled back and forth to Woods's house next door. Moffett stated that Davis returned between midnight and 2:00 a.m.
¶ 13. At about 1:00 a.m, Moffett announced that he was going to a club. Thomas did not want him to go and they started arguing. Woods called at 1:07 a.m. and asked them to come over. Moffett and Thomas went to Woods's house, returning at 1:20 a.m. He and Thomas argued because Moffett thought she and Woods had been shoplifting together. Moffett testified that he then made several calls to friends trying to get a ride to the club; the phone records show calls from Thomas's house to various telephone numbers, including Smith's. Thomas took a bath. Moffett asked Davis to leave so Moffett could get into the bath with Thomas, but Davis refused. Moffett made three more phone calls, all shown by the phone records. Moffett stated that Davis finally left at about 2:11 a.m. Moffett left a minute later. Just before leaving, Moffett heard Thomas on the phone asking Davis to return. Moffett walked down the street in front of Thomas's house to Minor Street, and was picked up by Ronnie Jones and other friends at the corner of Minor Street and Williams Street.
¶ 14. Jones testified that he was driving down Minor Street and saw Moffett walking down the street. Jones picked up Moffett, but was inebriated and unsure what the time was. Antonio Dawson stated that he was with Jones when they picked up Moffett on Minor Street. He did not see any blood on Moffett and thought Moffett was acting normally. Moffett testified that, after picking him up, *326 Jones rounded the block and they went to Zippy's convenience store. The video surveillance camera at Zippy's captured Moffett inside the store at 2:31 a.m.
¶ 15. Moffett testified that, after leaving Zippy's, Moffett, Jones, and the others drove around and smoked marijuana. Jones dropped Moffett off at Brumfield Apartments, and Moffett walked to the clubs. Marcus Shaw spotted Moffett at Queen's Club between 3:30 a.m. and 4:00 a.m.; Moffett was dressed in black. Angela Myles saw Moffett at Club Paradise between 3:00 a.m. and 4:00 a.m. Moffett said that Jones dropped him off at Brumfield Apartments at about 4:30. At 4:36, he called home and no one answered. This call was corroborated by the phone records. Moffett said that in the morning he received the news that Thomas had been killed and he walked back to Thomas's house. Before he got there, Kerry Johnson told him he needed to run. Moffett was scared and hid within Natchez. He said that, two days later, an old man named James drove him to Ferriday.
¶ 16. Moffett denied that he told Officer Ainsworth that he had been hunting and said that he told Officer Ainsworth his name. He denied that when he was at Harris's he told someone on the phone not to tell anyone where he was or that he told Harris he was going to Baton Rouge. Moffett also denied having threatened to kill Thomas on December 6 or 7, 2003, or saying that he wanted to see her family in black. He further denied having told Officer Nations that Jones had picked him up from Thomas's house rather than on the corner of Minor Street and Williams Street.
¶ 17. Shirley Green testified on behalf of Moffett. Green stated that she was an ordained minister who lived across the street from Thomas's house. Green testified that God woke her up at 3:00 a.m. on the morning of December 7, 2003, and she began saying prayers. Her prayers were interrupted by loud voices from outside. She looked out the window and saw Thomas, Woods, and Davis arguing on the front porch of Thomas's house. They were arguing about money; Green heard something about a thousand dollars. Then, Woods departed. Green went back to sleep.
¶ 18. On cross-examination, Green admitted that she had pled guilty to shoplifting, but maintained that she had never stolen anything before. Green admitted to having made a conflicting handwritten statement in February 2004. In the statement, she said that early on the night of the murder she saw a short man, of medium build, dressed all in black, emerge from the rear of Thomas's house and walk to the street. Green saw his face, but did not recognize him. In the statement she also said she heard the arguing after she had finished praying and had returned to bed, at about 3:00 or 4:00 a.m. When she looked out the window, she saw two women arguing, and also saw the man dressed in black come out of the house. She did not know who the women were. She never reported her observations to the police.
¶ 19. The jury found Moffett guilty of murder.

LAW AND ANALYSIS

I. DID REVERSIBLE ERROR OCCUR WHEN THE PROSECUTOR VIOLATED A COURT ORDER TO REFRAIN FROM OPINING THAT MOFFETT'S PRIOR DOMESTIC VIOLENCE CONVICTIONS INDICATED A PROPENSITY FOR VIOLENCE AGAINST THE VICTIM?
¶ 20. The trial court granted Moffett's motion in limine to exclude the evidence of several prior charges and convictions. *327 The trial court admitted two convictions and one charge of domestic violence that occurred in the three months prior to Thomas's death, finding them relevant to establish motive, intent, and possibly identity under Mississippi Rule of Evidence 404(b). At Moffett's request, the trial court granted a jury instruction stating that the conviction and charge were admitted to show motive, and restricting the jury from considering them as probative of Moffett's propensity to commit the crime.
¶ 21. During the second phase of closing arguments, the prosecutor stated:
I tell you what is reasonable, ladies and gentlemen. It's reasonable to believe that he had a propensity to commit this crime. He had already done it twice and three times in the last two months. He assaulted her, domestic violence. That don't mean you call them a name, folks, and he says, well, I admitted those. Yeah, you pay a fine and get suspended time. This is a murder charge. I think there's a little bit of falsehood if I was looking at that situation. It's different. But he had a propensity to commit the crime. Now they want to make a big deal about 
At this point, Moffett objected to the prosecutor's stating that the prior acts showed Moffett's propensity to commit the crime. The court sustained the objection and instructed the prosecutor to move on.
¶ 22. On appeal, Moffett argues that the trial court erred by not instructing the jury from the bench to disregard the propensity argument, and that he is entitled to a new trial. It has been established "that to preserve an objection to alleged improper remarks by counsel during closing argument, the complaining party must not only make a contemporaneous and specific objection to the remarks, but must also obtain a definitive ruling from the trial court on his objection and must request corrective action." Rials v. Duckworth, 822 So.2d 283, 287(¶ 22) (Miss.2002). Moffett did make a contemporaneous objection to the prosecutor's improper remarks. However, he did not request any corrective action from the trial court. Since Moffett did not request any corrective action from the trial court, this issue is waived for appeal. Id. We observe that the jury was instructed not to consider the convictions and charge as evidence of propensity, and the jury is presumed to have followed its instructions. Harmon v. State, 453 So.2d 710, 712 (Miss.1984).

II. DID THE PROSECUTOR'S IMPROPER EXAMINATION OF A WITNESS REQUIRE A NEW TRIAL?
¶ 23. During cross-examination of Shirley Green, the prosecutor asked Green about her shoplifting conviction. Then, the prosecutor asked Green if she had used the name Shirley Brown as an alias. Green denied it, and the following occurred:
Q. If the records from the police department show that as an alias from you 
A. No 
Q.  that's not true?
A. No, sir. That's not true. It's two or three other Shirley Greens in Natchez.
Q. But your date of birth is 6-14 of 1950, right?
A. Yes, sir. That's correct.
Q. And your social security number is 
A. Yeah, and you don't have to call it out because that's my private number 
Q. I'm not going to call your number out, but that's the 
A. Yes, sir.
Q.  one we talked about before, right?

*328 A. Yes, sir.
Q. So you have never gone by Shirley Brown?
A. No, sir. Never have.
Q. Have you gone by Shirley Bryant?
A. No, sir. I've always went by Shirley Evans which is my maiden name. King was my first married name, and Green was my second husband. Those the names that I use.
Then, the prosecutor asked Green about fifteen other aliases and Green denied having used each one. Green stated that, if the police had those names listed as aliases for her, the police were in error.
¶ 24. Moffett did not object to this cross-examination. On appeal, Moffett argues that the prosecutor's questioning of Green about the aliases entitles him to a new trial pursuant to Smith v. State, 457 So.2d 327, 334 (Miss.1984). Moffett argues that the prosecutor's questioning of Green was improper, inflammatory, and prejudicial and denied him a fundamentally fair trial.
¶ 25. Counsel must have a good faith basis for questions asked on cross-examination. Flowers v. State, 773 So.2d 309, 326(¶ 58) (Miss.2000). In Smith, on numerous occasions during the trial, the prosecutor attempted to impeach the credibility of defense witnesses with questions that constituted unfounded "sneers and innuendo." Smith, 457 So.2d at 334. For example, in one instance, the prosecutor asked a defense witness whether "she was selling her body in Jackson like she did on the coast." Id. The prosecutor did not possess any proof supporting the question. Id. The prosecutor also repeatedly violated directives from the court not to explore certain lines of impeachment questioning. Id. at 335. Though Smith had failed to object to some of the instances of prosecutorial misconduct, the court held that the cumulative effect of all the instances had rendered Smith's trial fundamentally unfair. Id. at 336.
¶ 26. Here, according to Moffett's reply brief, the prosecutor had obtained the aliases from the police department. Therefore, the prosecutor had a good faith basis for asking Green about the aliases. Whether Green had employed aliases in the past was probative of her truthfulness or untruthfulness and impacted her credibility as a witness. The questioning in this case fell far short of what would constitute reversible error under Smith. This issue is without merit.

III. WAS THE EVIDENCE INSUFFICIENT TO SUPPORT THE MURDER CONVICTION?
¶ 27. Moffett argues that the evidence was insufficient to sustain his murder conviction and, therefore, the trial court should have granted his motion for a JNOV. In reviewing the denial of a motion for a JNOV, this Court asks whether, considering the evidence in the light most favorable to the State, any rational jury could have found the essential elements of the crime beyond a reasonable doubt. Bush v. State, 895 So.2d 836, 843(¶ 16) (Miss.2005) (quoting Jackson v. Virginia, 443 U.S. 307, 315, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). "Should the facts and inferences . . . `point in favor of the defendant on any element of the offense with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty,' the proper remedy is for the appellate court to reverse and . . . discharge." Bush, 895 So.2d at 843(¶ 16) (quoting Edwards v. State, 469 So.2d 68, 70 (Miss.1985)). However, the evidence will be found sufficient if a reasonable jury, applying the beyond a reasonable doubt standard, might reach different conclusions on each element of *329 the offense. Id. It is the jury's role to assess the weight and credibility of the evidence and to resolve conflicts in the evidence. Latiker v. State, 918 So.2d 68, 73(¶ 12) (Miss.2005). The jury may accept the testimony of a witness in whole or in part, may reject a witness's testimony altogether, and may accept in part and reject in part the evidence on behalf of the State or on behalf of the accused. Mangum v. State, 762 So.2d 337, 346(¶ 35) (Miss.2000). We observe that, while this case involved considerable circumstantial evidence, Moffett's threats to kill Thomas were admissions on the element of deliberate design and constituted direct evidence of his guilt, obviating our treatment of this case as purely circumstantial. See Garrett v. State, 921 So.2d 288, 292(¶ 20) (Miss.2006).
¶ 28. For this Court to affirm Moffett's conviction, there must have been sufficient evidence to enable a rational jury to find beyond a reasonable doubt that Moffett killed Thomas without authority of law and with deliberate design to effect her death. Miss.Code Ann. § 97-3-19(1)(a) (Rev. 2000). Viewing the evidence in the light most favorable to the State, there was sufficient evidence to enable a rational jury to find that Moffett formed a deliberate design to kill Thomas and that he did kill Thomas. Moffett's two convictions and one charge of domestic violence against Thomas in the three months prior to her death were admitted into evidence to show Moffett's motive and intent to harm Thomas. Two corrections officers overheard Moffett state his intent to kill Thomas after she refused to bail him out of jail upon his third domestic violence arrest. Thomas was killed several days after Moffett made this threat. On the night of Thomas's death, Davis observed Moffett again threatening to kill Thomas. Davis saw that Thomas was afraid of Moffett. Williams and Woods also observed Moffett and Thomas arguing that night.
¶ 29. Davis departed Thomas's house at 2:15 a.m. Thomas called Davis at 2:16 a.m. Moffett was picked up on Minor Street shortly thereafter and was seen at Zippy's convenience store at 2:31 a.m. Officer Nations testified that it took between three minutes and three minutes and forty-five seconds to walk from Thomas's house to the corner of Minor and Williams Streets, and two minutes and forty-five seconds to travel by car from that corner to Zippy's. Officer Nations testified that, given these times, Moffett had an opportunity to kill Thomas between approximately 2:16 a.m. and 2:25 a.m. Moffett's statement to the police differed from his trial testimony concerning both the time that he left Thomas's house and where he was picked up by Jones, supporting a reasonable inference that Moffett was lying about his activities during the relevant time period. From the aforementioned evidence, a rational jury could find that, after Davis departed, Moffett followed through on his earlier threats to kill Thomas and then fled the crime scene, being picked up moments later on Minor Street by Jones. Moffett's phone call at Harris's in which he told someone not to reveal where he was, his flight to Ferriday, Louisiana, and his suspicious behavior upon apprehension by the police also support this conclusion.

IV. WAS THE VERDICT AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE?
¶ 30. Next, Moffett argues that the trial court should have granted his motion for a new trial because the verdict was against the overwhelming weight of the evidence. On review of the denial of a motion for a new trial, we view the evidence in the light most favorable to the verdict, and determine whether the evidence so heavily preponderated against the verdict that an unconscionable injustice *330 would result from the denial of a new trial. Bush, 895 So.2d at 844(¶ 18). The power to grant a new trial should be exercised only in exceptional cases. Id.
¶ 31. Viewing the evidence in the light most favorable to the verdict, the evidence shows that several witnesses heard Moffett threaten to kill Thomas several days before her death and on the night of her death. Further, Moffett had committed three acts of domestic violence against Thomas in the three months before her death. According to the testimony of every pertinent witness on the issue other than himself, Moffett had the opportunity to kill Thomas. And, Moffett fled the day after Thomas's death and was apprehended in another state. The testimony of Green, which was the only evidence that Thomas was alive between 3:00 a.m. and 4:00 a.m., conflicted materially with Green's own prior handwritten statement. We cannot say that the evidence so heavily preponderated against the verdict that a new trial is required to avoid an unconscionable injustice.

V. DOES THE CUMULATIVE EFFECT OF THE ERRORS REQUIRE REVERSAL?
¶ 32. Moffett argues that errors occurred in this case, that, when considered cumulatively, entitle him to a new trial. Moffett raised this issue for the first time in his rebuttal brief, thus depriving the State of the opportunity to respond to the issue. Therefore, we do not consider it. Bishop v. State, 882 So.2d 135, 154-55(¶ 51) (Miss.2004).
¶ 33. THE JUDGMENT OF THE CIRCUIT COURT OF ADAMS COUNTY OF CONVICTION OF MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AS A HABITUAL OFFENDER IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO ADAMS COUNTY.
KING, C.J., LEE AND MYERS, P.JJ., SOUTHWICK, IRVING, GRIFFIS, BARNES, ISHEE AND ROBERTS, JJ., CONCUR.