299 So.2d 682 (1974)
Fred R. TUDOR, Jr.
v.
STATE of Mississippi.
No. 48017.
Supreme Court of Mississippi.
September 3, 1974.
*683 Harry L. Kelley, Jackson, for appellant.
A.F. Summer, Atty. Gen., by Wayne Snuggs, Sp. Asst. Atty. Gen., Jackson, for appellee.
WALKER, Justice:
The appellant, Fred R. Tudor, Jr., was tried in the First Judicial District of Hinds County, Mississippi, convicted of the sale of marijuana and sentenced to serve 12 years in the state penitentiary. From that judgment, he prosecutes this appeal. We reverse and remand for a new trial.
Steven J. Elson, an undercover agent for the Jackson Police Department, cultivated the friendship of one Robert Talley for the purpose of gathering evidence against drug law violators. On the night of July 25, 1972, Elson and Talley were riding around discussing where various drugs could be bought and thereafter went to the home of the appellant. Upon arrival at Tudor's home, Elson remained in the car which was approximately 25 yards from Tudor's lighted carport. Elson testified that from his location he observed Talley go to the door of Tudor's house which opened onto the carport, knock and go inside; that a short time later, Tudor and Talley came out onto the carport where Tudor handed Talley a package which Talley brought to the car and gave to him in exchange for $15.00; that Talley then walked back to the carport and handed the money to Tudor. This was the extent of the state's case relative to the act of sale. There is no dispute about the substance admitted into evidence being marijuana.
After the state rested, Robert Talley testified for the defendant that he went to Tudor's home to see on Paul Adams but Adams had left before he arrived. He denied that Tudor had handed him a package of marijuana as he testified that he had the marijuana stuck in his belt under his shirt at the time he went to Tudor's home and that he made it appear that he got the marijuana from Tudor so that he could sell it to Elson. Talley's explanation was as follows:
Well, I went in there to see Paul Adams. They told me he wasn't there, you know, that he'd left, you know. I stood around there a few minutes, you know, and really didn't know what to do then. So I seen this motorcycle out there. He had this motorcycle and he wanted to show me his motorcycle. So I walked out the door, you know, and as I walked out I thought, well, I'd just settle Steve down and, you know, act like I got it out here, you know. So I just slipped a weed out like that, you know, and put it down and went out there and got the fifteen dollars from Steve, you know, and come back up there. First I handed him the weed, the marihuana, and I put the money in my pocket and I went back up there and I told Fred I had to go, to tell Paul I'd see him later, talk to him later. And I turned and left.
He also testified that he purchased the marijuana earlier that afternoon for $12.00 and by selling it to Elson made a profit of $3.00.
*684 Talley was twenty-five years of age at the time of the trial and admitted to a number of prior criminal convictions as well as having smoked marijuana, taking and selling drugs and generally being involved in the drug scene.
Tudor took the stand in his own behalf and testified that Talley came to his home on the night in question and asked for Paul Adams who had been there earlier but who had left just before Talley arrived. He further testified that Talley came into his home where they talked for a short while before going out onto the carport but denied that he gave Talley any marijuana.
The evidence disclosed that Tudor had no prior record, was married, had two children and had a record of steady employment.
The only evidence in the case pointing to Tudor's guilt was that of the undercover agent Elson who testified that he saw Tudor hand Talley a package which Talley brought to Elson's car and gave to him in exchange for $15.00 and then returned to the carport and handed the money to Tudor.
What has been outlined above was essentially all of the relevant evidence in the case and alone would present a close question on the issue of proof of guilt beyond a reasonable doubt for a jury to resolve. Ordinarily the jury's verdict would not be overturned; however, there was a great deal more evidence in the case than that outlined above and most of it was inadmissible and prejudicial. Appellant's only assignment of error is that:
The Defendant was denied a fair and impartial trial by the admission into evidence of prejudicial and irrelevant matters calculated to confuse, mislead and inflame the jury.
Since we have concluded that this case must be reversed and remanded for a new trial, we have thoroughly considered the record and would point out a number of errors, some of which were specifically complained of by appellant and some of which were not, which should not recur upon a new trial.
Early in the state's case in chief, agent Elson was allowed to testify as to what he had "determined" to be the purpose of his and Talley's trip to Tudor's house, his answer being "to purchase marijuana." There was an objection by defense counsel on the grounds that the state was attempting to do in an indirect manner what it could not do directly. The essence of the objection was that this was hearsay, and he was correct in that regard since the only way that Elson could have "determined that they were going to Fred Tudor's house to purchase marijuana" was by what Talley had supposedly told him. This amounted to blatant hearsay and was highly prejudicial at the outset of the case. Later in his testimony, Elson, when identifying the package that he allegedly received from appellant, testified that he had made a note on the package to the effect that it was "one lid, grass dusted with smack." He then stated that this (smack) is of course heroin. Needless to say, for the state to unnecessarily inject heroin into this close case was inflammatory and prejudicial. Also during the state's cross-examination of the defendant's witness Talley, he was asked how many times he had been over to Fred Tudor's house and what he did over there, to which he replied: "Oh, I just talked to Paul. Me and him just rapped, you know, on about things happening, you know, about different people and so forth and so on." Then the district attorney asked such questions as:
"Did you smoke a little weed over there? Huh?"
"Did you sell any over there?"
"Did you sell any other drugs over there?"
"Did you buy any over there?"
*685 All of these questions related to separate crimes with which the appellant was not charged and was not on trial and therefore were highly prejudicial. Then, when Tudor was on the stand being cross-examined by the state, he was asked whether he knew a John Searcy and whether or not he had visited Searcy in jail. It was also developed that Searcy was serving time for possession of marijuana. Tudor's connection with Searcy had nothing to do with the crime charged and the questions were improper as it was an attempt to have the jury find appellant guilty by association. At another time, the state questioned Tudor about the termination of his employment with the telephone company, about which he was asked the following question: "Now Fred, your termination at the Telephone Company's employment approximately August the 15th, was that at your choice or the Telephone Company's choice." It was improper to question Tudor about the termination of his employment with the telephone company as it was designed to leave the inference that the telephone company had discharged him due to the drug charge. This might be true, but that was a question for the jury to determine without being influenced by what the telephone company had done. After the defendant rested, agent Elson was called in rebuttal whereupon he was asked this question: "Steve (Elson) tell us that day before you went over to Tudor's house or while you were going over there, what else if anything did Talley say regarding Fred Tudor?" To which he answered: "We discussed the drugs and the type of drugs that we could purchase. The main thing we were talking about before this was a drug called crystal." The injection into the trial of a drug called crystal was prejudicial error since appellant was not on trial for selling a drug called crystal as well as the fact that it was hearsay. Another question asked Elson was: "Now Steve, tell us what Talley said to you with regard to Fred Tudor concerning marijuana as far as your trip over there is concerned?" To which he replied: "He told me that Fred would have marijuana and that we could get some from Fred." This was purely hearsay amounting to nothing more than Talley's opinion and was highly prejudicial.
Appellant's counsel failed to object to some of the above matters, objected to others with the objection being sustained, and in some instances the court instructed the jury to disregard the testimony. In other instances, the objection was overruled and the evidence admitted. Some of the errors were more serious than others and although some of them may not alone constitute reversible error, we have no hesitancy in finding that a combination of all of the above deprived the appellant of his due process right to a fair and impartial trial. Incompetent evidence, inflammatory in character, when presented to a jury carries with it a presumption that it was harmful. McDonald v. State, 285 So.2d 177 (Miss. 1973). We will reverse a conviction unless it can be said with confidence that the inflammatory material had no harmful effect upon the jury. Coleman v. State, 198 Miss. 519, 23 So.2d 404 (1945). In McDonald, supra, Justice Broom speaking for the Court said:
It is error in the course of a trial where one is charged with a criminal offense for the state to inject extraneous and prejudicial matters and lay them before the jury. A combination of such instances may become fatal error and ground for reversal even though the court sustains objections to such questions... . One of the ingredients of a fair and impartial trial is that an accused person should be tried upon the merits of the case. Expressing it another way, the question of guilt or innocence of the crime charged should be received by the jury unhampered by any suggestion or insinuation of any former crime or misconduct that would prejudice jurors... . We commend vigorous prosecutions so long as they are conducted within the rules of evidence. Our adversary system of jurisprudence *686 does not contemplate that attorneys for either side will be completely passive or indifferent during court trials. Yet, fundamental fairness requires that any defendant should not be subjected to testimony and tactics which are highly inflammatory and prejudicial as shown by the record before us. See Allison v. State, 274 So.2d 678 (Miss. 1973); Kelly v. State, 278 So.2d 400 (Miss. 1973); and Wood v. State, 257 So.2d 193 (Miss. 1972). (285 So.2d at 180).
We are of the opinion that the appellant was subjected to such irrelevant, inflammatory and prejudicial evidence that he was effectively denied his right to a fair and impartial trial. Therefore, the case must be reversed and remanded for a new trial for another jury to determine his guilt or innocence.
Reversed and remanded.
RODGERS, P.J., and ROBERTSON, SUGG and BROOM, JJ., concur.