# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-KA-00523-COA

KARON McVAY A/K/A KARON DESHAWN McVAY          APPELLANT

v.

STATE OF MISSISSIPPI          APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 02/04/2022 |
| TRIAL JUDGE: | HON. CHARLES W. WRIGHT JR. |
| COURT FROM WHICH APPEALED: | LAUDERDALE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: GEORGE T. HOLMES |
| |     W. DANIEL HINCHCLIFF |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: ALLISON ELIZABETH HORNE |
| DISTRICT ATTORNEY: | KASSIE ANN COLEMAN |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 05/21/2024 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., LAWRENCE AND McCARTY, JJ.**

**LAWRENCE, J., FOR THE COURT:**

¶1. Karon McVay was convicted by a Lauderdale County Circuit Court jury of four counts of capital murder and one count of possession of a firearm by a felon. The court sentenced McVay to life imprisonment without eligibility for parole for each capital murder conviction and ten years to serve in custody for the possession of a firearm, with each sentence set to run consecutively to the other. McVay appeals his convictions claiming the State improperly introduced prior bad-acts evidence during its cross-examination of him without an evidentiary basis. McVay also argues his trial counsel was constitutionally

ineffective by failing to object to the State's questions. Finding no error, we affirm.

## FACTUAL BACKGROUND

¶2.     On February 21, 2017, deputies with the Lauderdale County Sheriff's Department conducted a welfare check at 4009 Butts Road in Toomsuba, Mississippi. Officer Trey Fox arrived and found Edna Durr, her daughters Tomecca Pickett and Kiearra Durr, and her grandchild Owen Pickett deceased. Deputies found three-year-old B.D.[1] alive, trapped underneath the body of her mother, Kiearra. The officers called an ambulance and removed B.D. from the home. The Mississippi Bureau of Investigations assisted in the collection of evidence at the scene of the crimes.

¶3.     The police learned that the day before the killings, McVay had visited his girlfriend, Tomecca, at her place of employment, Rush Hospital in Meridian.[2] Tomecca was having lunch with her brother Demetrius in the hospital cafeteria when McVay arrived. Tomecca and McVay got into an altercation and security was called to escort McVay out of the hospital. McVay testified that Tomecca told him she was going to have him banned from the hospital. McVay admitted that during the argument at the hospital, he told Tomecca she would "never disrespect" him "like that again" and that if she did, he would put her jaw "on the other side of her lip."

¶4.     The next day, Demetrius called McVay to tell him that the family was murdered. McVay lied to Demetrius and said he was out of town for a construction project. The record

---

[1]  We use initials to protect this minor's privacy.

[2]  McVay admitted that on the day before the hospital incident, Tomecca texted him indicating she was "done" with him.

2

indicated he was really at Meridian City Hall for a job interview. McVay left city hall and went straight to the crime scene and, in fact, beat Demetrius to the scene. At the crime scene, Deputy Karey Williams asked McVay and Tomecca's brother Tievo Durr to go to the sheriff's department so they could take a statement. McVay was not an immediate suspect but became one after giving suspicious responses to initial police questions.

¶5. McVay was given his *Miranda*[3] warnings and he allowed police to search his phone. Text messages revealed that the day before the murders, Tomecca had indicated to McVay that she was "done with it." McVay responded that she would not curse at him again and continued to call Tomecca numerous times that day. During the interview, Williams learned that McVay resided in the home located at 4009 Butts Road. He also learned that McVay had a felony conviction.[4] Additionally, McVay admitted that he had a gun and that this gun was located at the scene of the crime.[5] On this information, McVay was arrested for the charge of possession of a firearm by a felon. McVay continued denying any involvement in the murders. As the deputies were walking McVay to jail after completion of the interview, McVay asked Investigator Everett McSheppard how much time he was "looking at" for the "four murders[.]" McVay indicated that he wanted to tell the truth and was returned to the interview room where he was read his *Miranda* rights a second time. McVay gave a verbal

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[4] At trial, it was stipulated that McVay was convicted of a felony in Alexandria, Virginia on July 31, 1998.

[5] This gun was a ".243 rifle," and it was recovered by another police officer at the crime scene. The gun was entered into evidence.

statement admitting he killed the four victims. He claimed he brought Tomecca a gift and an argument ensued, which became physical and escalated to the point that he fired "two shots at Tomecca." Tomecca's five-year-old son Owen "walked out, and [McVay] fired at him." He then shot at Edna, and as "Kiearra moved on the couch" he fired shots at her too. He then fired more shots at Tomecca. Based on the information McVay provided during the second interview, the detective typed a statement, which McVay signed and fingerprinted.

¶6.    The autopsies of each victim indicated that Edna (sixty-five years old) died from multiple gunshot wounds to her back, left and upper-right chest area, abdomen, right arm, and left arm. There was no stippling on any of the many gunshot wounds, and only one projectile was recovered. Tomecca (forty-two years old) died from three distant gunshot wounds: one to her head, one to her upper left arm, and one to her right breast. Projectiles were recovered from Tomecca's body. Kiearra (twenty-seven years old) died from four gunshot wounds and three sharp-force injuries to the neck. One gunshot wound entered her upper left shoulder, one entered her left chest, one entered her abdomen, and one entered her right chest. Two projectiles were recovered from Kiearra's chest. Owen (five years old) died from a total of four stab and slash wounds to his neck; two were superficial, one severed his jugular vein, and the last one severed his trachea. The wounds caused him to bleed into his lungs, and according to Dr. Levaughn, he basically drowned "in his own blood."

¶7.    On November 8, 2018, a Lauderdale County grand jury indicted McVay and charged him with Count I, capital murder of Owen Pickett, Count II, capital murder of Kiearra Durr, Count III, capital murder of Tomecca Pickett, Count IV, capital murder of Edna Durr, Count

4

V, possession of a weapon by a felon, and Count VI, possession of a stolen firearm. All the murders were alleged to have occurred during the commission of the murder of three or more persons "who are killed incident to one (1) act, scheme, course of conduct or criminal episode" pursuant to Mississippi Code Annotated section 97-3-19(2)(i) (Supp. 2015).

¶8.     Before trial, the State filed a motion in limine to introduce evidence of McVay's prior bad acts pursuant to Mississippi Rule of Evidence 404(b). Specifically, the State sought to introduce the testimony of (1)Tomecca's brother Demetrius Durr, who would testify about the incident at Rush Hospital; (2) Justin Boykin, a security guard at Rush Hospital; (3) Tony Furline, a second security officer at Rush Hospital; (4) Officer Heather Luebbers, a Meridian police officer who made a 2014 report of a domestic violence incident between McVay and Tomecca; (5) Tomecca's sister Tamaria Durr Hudson, who would testify about the "history of domestic violence" between Tomecca and McVay; and (6) Tomecca's husband Raymen Pickett, who would also testify to the violent history between Tomecca and McVay.[6] The State claimed the information was "essential for the jury to have a full understanding of [the] victim's death at the hands of the Defendant." The State attached police reports that included statements from Tomecca describing an incident on December 22, 2014. The police report indicated that Tomecca and McVay had gotten into an argument. The report included statements from Tomecca indicating that McVay had threatened to "blow [Tomecca's] f****** head off," told her they were going to "play Russian roulette," and said, "If I can't have you nobody else will." Tomecca's statement provided that McVay "slapped [Tomecca]

_____

[6] At the time of her murder, Tomecca was still legally married to Raymen even though she was dating McVay.

5

with [a] cuffed hand, bit [her] nipples, pressed [his] elbow in [her] . . . chest, choked [her] . . . [and] covered up [her] nose [and] mouth."

¶9.     On January 11, 2022, the trial court considered the admissibility of the evidence concerning the December 22, 2014 incident and found that "the potential prejudicial effect on [McVay] [did] not substantially outweigh the probative value of such evidence under Miss. R. Evid. 403; and rather than confuse the issues, will help the jury understand the events which occurred leading up to [McVay]'s arrest and subsequent indictment." Accordingly, the trial court ordered that this evidence was admissible "under Rule 404(b), to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, but not for character evidence."[7]

¶10.     The State filed a motion to dismiss Count VI,  possession of a stolen firearm, on the first day of trial.[8]  McVay was tried on the five remaining counts beginning on February 1, 2022.  The State called nine witnesses to testify, and the defense called only McVay.  During the trial, the parties stipulated that McVay had been previously convicted of a "felony in the circuit court of the City of Alexandria, Virginia on July 31, 1998."  The stipulation did not specify the particular felony of which McVay had been convicted.

¶11.     During trial, the State introduced text messages between McVay and Tomecca.  The

---

[7] The trial court granted the State's motion in limine as it pertained to the testimony of Demetrius Durr, Justin Boykin, Tony Furline, Heather Luebbers, and Raymen Pickett. The trial court denied the State's motion as it pertained to Tamaria Durr-Hudson.  Only Demetrius Durr and Justin Boykin actually testified at trial.

[8] The court granted the motion and entered the order on February 7, 2022, after the trial.

texts were sent on February 19-21, 2017, and were depicted by a photograph of the text messages. On February 19, 2017, between 12:30 and 12:43 a.m., the following text message exchange occurred:

> TOMECCA: U know what, its good. I'm done with it. I done gave u 2 much time. Enough. Enjoy what u got left. Gn[.]

> McVAY: I been callin u . . . . That is your last time that u will ever . . . say that [I] am a got dam lie. . . . That your last time that you will ever[] curse a[t] me[.]

¶12. Demetrius Durr, Tomecca's brother, also testified at trial. Pertinent to the issues on appeal, he testified that B.D., the only survivor, was between two and three years old and could not "talk or hear." He explained that McVay lived "on and off" at the house with all the victims, and he knew about B.D.'s health issues. Demetrius also confirmed the incident between Tomecca and McVay that occurred at the hospital. He testified he was with Tomecca when McVay showed up "looking crazy and everything." He testified they were "arguing back and forth" and finally McVay left. He accompanied Tomecca to security at the hospital so she could "put a stop to him coming up on her job, stalking her and harassing her."

¶13. Demetrius also explained that later that night, before 10:00 p.m., he called and spoke to Edna, his mother. He recalled they talked about a wrestling show while it was on, and the show ended at 10:00 p.m. He said he heard about the victims' deaths the next day and immediately called McVay, who said he was working out of town. However, the record indicates that McVay actually arrived at the scene of the crime *before* Demetrius. Finally, Demetrius explained that Tomecca and McVay's relationship had "ups and downs" but

McVay hid "all the abuse and stuff he was doing to [Tomecca]." McVay did not object to Demetrius's answer about abuse and asked no questions on cross-examination.

¶14.    Justin Boykin testified for the State. On February 20, 2017, he was in charge of security at Rush Hospital. He reviewed a report of an altercation in the hospital cafeteria between Tomecca and McVay. Boykin described Tomecca as "crying" and "very upset." Boykin also described his interaction with Tomecca. She was "very upset" and "wanted to separate herself from McVay." Boykin explained to Tomecca which police department with jurisdiction could assist her since "she was visibly scared of [McVay]." Later, about thirty minutes after speaking with Tomecca, Boykin received a telephone call from McVay. At first, McVay identified himself to Boykin with a different name. Ultimately, he admitted he "had an altercation" with Tomecca that was a "misunderstanding," and he wanted Boykin to allow him to speak to her. Boykin refused and told McVay he could no longer come onto hospital property unless he was seeking medical treatment.

¶15.    Angela Shelby testified for the State. On the date of the crime, Angela was a medical secretary at Rush Hospital. Her job included collecting deposits for various hospital departments. She knew Tomecca because she would take Angela the emergency room deposits. She saw Tomecca at work on February 20, 2017. She remembered talking to Tomecca by telephone that night at approximately 8:30 p.m. Tomecca thanked Angela for some children's books she had given her. Tomecca was trying to get Owen to come to the telephone, but the phone "cut off." She attempted to call Tomecca back, but there was never any answer.

8

¶16.   Karey Williams also testified for the State.  At the time of trial, Karey was a lieutenant over investigations, but at the time of the crime, he was an investigator with the Lauderdale County Sheriff's Department.  He arrived at the scene and noticed Edna's body on the floor of the living room.  He noticed a 9-millimeter bullet and a spent projectile next to the body.  Just past Edna, he saw Kiearra's body with her knees on the floor and her face down on the couch.  Tomecca's body was in the hallway, and Owen's body was lying in the doorway to the bathroom off the hallway.  His body was positioned halfway in the hallway and halfway in the bathroom.

¶17.   Williams testified he saw McVay at the scene and asked him to go to the police station to give a statement.  McVay wrote out a handwritten statement that later would be introduced into evidence.[9]  Williams looked at McVay's phone and confirmed he had called Tomecca forty-three times and sent her threatening texts.  McVay admitted to having a rifle at the crime scene, and it was recovered and introduced into evidence.  McVay denied committing any murders throughout the first interview.

¶18.   After the interview, McVay was charged with being a felon in possession of a firearm.  While he was being transported to jail for this charge, McVay asked another officer, "[H]ow much time will I be looking at for these four murders?"  After the other officer answered him, McVay told Williams, "I want to talk.  Now, I want to tell the truth."  McVay was

---

[9]  In the handwritten statement, McVay described the Rush Hospital incident and admitted to arguing with Tomecca and making a physical threat.  He admitted to going to Tomecca's house twice on the day of the crime, and he admitted that an argument with Tomecca occurred while he was there.  Finally, without any prompting, McVay admitted that he touched Owen's head several times.  The written statement raised questions that caused Williams to question McVay in more detail.

interviewed a second time when he confessed to the murders. McVay told Williams he gave the gun he used to someone named "Mon."[10] Williams found Mon, who guided him to the location of the firearm. Williams recovered a 9-millimeter pistol that had no bullets in it.[11]

¶19. The State called Starks Hathcock, who was a forensic scientist at the Mississippi Crime Laboratory for 27 years and specialized in firearms identification. He was tendered and accepted as an expert in "firearm and tool marker" identification. Hathcock opined that two projectiles recovered from Tomecca's body were shot from the 9-millimeter pistol. Two projectiles recovered from Kiearra's body had been shot from the 9-millimeter pistol. One projectile recovered from Edna's body had been shot from the 9-millimeter pistol. Finally,

---

[10] The typed statement that McVay signed and affixed his fingerprint to reads as follows:

> I came into the room and gave Tomecca a gift. I touched her hair and said it looked nice. Tomecca said don't touch my hair. I touched it again and she smacked me. I shoved her back into the dresser and she turned around to grab some scissors. She said, "that is the last time you ever put your f****** hands on me." I walked out into the hall and she came out into the hall and pushed me. She called me a no good sorry motherf****** and she was tired of this shit. I turned and fired two shots at Tomecca. Owen walked out and I fired at him. Ms. Edna said what the f***s going on and I fired two shots at her. [Kiearra] moved on the couch and I fired two shots into her. I turned and fired two more shots at Tomecca, while she was walking towards me. Owen was behind Tomecca and moved the door which made me shoot in the direction of the movement. I then turned and fired at Ms. Edna again. I was standing in the living room by the kitchen when I was shooting. I was shooting a 9mm pistol. I am making this statement without any threats or promises to me.

[11] It is important to note that scissors were located in another area of the crime scene after McVay's confession. They were on the floor in the bathroom off the hallway where Tomecca was found. McVay never admitted to cutting Owen's throat but did admit he fired the gun in Owen's direction.

Hathcock opined that eleven casings found at the scene of the quadruple homicide had been spent from the 9-millimeter pistol that the police recovered from "Mon."

¶20.    Finally, during trial, McVay chose to testify and was the only witness called by the defense. McVay testified he owned a construction company and was a "general contractor building houses." On the day in question, McVay testified he was at "city hall" for a "job interview" when Tomecca's brother, Demetrius, called his phone. Demetrius told him "Tomecca and them had been killed." McVay testified he was "speed-bumping" to get to Tomecca's house. Once McVay arrived at the crime scene he met a detective, who told him "what was going on, what took place, they had one survivor." McVay asked Detective Anderson who the survivor was, but he "wouldn't tell [McVay]." The police asked McVay to go to the police station and he did so.

¶21.    At the police station, McVay was guided to an interview room where he wrote a statement. McVay let the police look through his cell phone, and he was confronted with the fact that he had called Tomecca "43 times." He responded, "That's my girlfriend. I can call her 143 times." McVay admitted to calling Tomecca "a bunch of times" over the "course of a weekend." He testified Tomecca was "hot," and she kept hanging up on him. McVay testified Tomecca was "hot" because he was supposed to get her a ring, but he "didn't." She was also upset because her desk at Rush Hospital was the same desk that had been previously used by a girl that McVay "used to date." McVay testified that "[s]he was at the exact same desk, exact same computer and everything." McVay testified he and Tomecca had "very heated arguments" but denied anything physical had ever occurred.

11

¶22. Further, McVay testified the police showed him a photo of himself at Rush Hospital and told McVay that he had been there to "make a threat" to Tomecca. McVay admitted he went to Rush Hospital for lunch and to "surprise" Tomecca, but Tomecca's brother Demetrius was there too. He testified he was attempting to eat some of her food when Tomecca slapped his hand away and told him he was "messing" with other women who worked at Rush Hospital. He testified his exact words to Tomecca were, "[I]f you keep disrespecting me, I will put your face on the side of your jaw." He added, "[D]on't disrespect me in front of your brother now . . . you can say to me whatever" at home, but "don't do that out in public." McVay testified he had a "super" relationship with Tomecca and stated that it hurt him to hear other witnesses describe their relationship as abusive because that was not the case. In the end, McVay testified he did not murder his family, but he previously admitted to police that he had killed them to "give them what they want[ed]."

¶23. Defense counsel tendered McVay for cross-examination. Before the State started cross-examination, McVay made the following narrative statement to the jury:

> I want to let the jury know, I was an Airborne Ranger. My lawyer might not want me to say it, but this is my life. This is all I have. I looked at those stab marks and those cut marks that's around my son's neck. That shit wasn't right. I looked at the cut marks and the jugular marks around Kiearra's neck. That shit wasn't right. Now, I was an Airborne Ranger, Special Forces, a weapons specialists. There ain't no way in hell that somebody of my degree, my caliber -- I don't know if any of y'all know about Rangers or SF. I don't know do you know anything about that. I also do taekwondo, so I know pressure points. That don't look and did not look like somebody that have the training that I have and did no crap like that.

¶24. During cross-examination, the State confronted McVay about his typed statement confessing to the four murders. McVay indicated that statement was not true except for the

12

part where he admitted to having been in the house to give Tomecca a gift. He admitted he went to the house to give her the gift after the argument at Rush Hospital earlier that day. He admitted that after the hospital incident, Tomecca told him she was going to have security ban McVay from the hospital. He told Tomecca, "[D]o what you have to do."

¶25. Further, the State confronted McVay about his testimony that he and Tomecca did not have an abusive relationship and that their arguments never got physical. The State did this by asking McVay about an incident where Tomecca had called the police in 2014. The specifics of this exchange will be recounted later in the analysis as it relates to the issue on appeal.

¶26. After being instructed on the law and hearing the arguments of counsel, the jury returned a guilty verdict of four counts of capital murder and one count of possession of a firearm by a felon. McVay now appeals claiming it was error for the State to ask him the questions about the prior domestic violence issue with Tomecca. He further claims he received ineffective assistance of counsel because his attorney did not object to those questions.

**STANDARD OF REVIEW**

¶27. "A trial judge has considerable discretion as to relevancy and admissibility of evidence[,] and unless this judicial discretion is so abused as to be prejudicial to the accused we will not reverse on these grounds." *Taylor v. State*, 374 So. 3d 617, 625 (¶20) (Miss. Ct. App. 2023) (quoting *Harvey v. State*, 365 So. 3d 218, 224 (¶43) (Miss. 2023)). "The relevancy and admissibility of evidence are within the discretion of the trial judge and will

13

not be reversed unless that discretion has been abused." *Amos v. State*, 360 So. 3d 323, 330 (¶25) (Miss. Ct. App. 2023) (citing *Tidwell v. State*, 806 So. 2d 1146, 1148 (¶7) (Miss. Ct. App. 2002)). The standard of review for claims of ineffective assistance of counsel is de novo. *Latham v. State*, 299 So. 3d 768, 772 (¶12) (Miss. 2020). "To prevail on an ineffective-assistance-of-counsel claim, a defendant must prove that counsel's performance was both deficient and prejudicial." *Id.* (quoting *Stevenson v. State*, 283 So. 3d 697, 700 (¶10) (Miss. 2019)).

## DISCUSSION

### I.    Prior Bad Acts Evidence

¶28.    McVay argues the State committed prosecutorial misconduct when it questioned him regarding a prior charge of domestic violence that occurred in 2014. McVay claims the State questioned him on these prior bad acts without an evidentiary foundation and that this rendered his trial "unfair." At trial, McVay denied during his direct and cross-examination that he had ever been "physical" with Tomecca. In an obvious effort to impeach McVay, during his cross-examination, the State asked several questions regarding these prior alleged acts of physical abuse. Those questions produced the following exchange:

> STATE:    Mr. McVay, you testified on two separate occasions on direct examination that the relationship between you and Mecca[12] had never been physical. Do you recall that?
> McVAY:    Yes, ma'am.
> STATE:    So it is your testimony to the [ ] jury that in December of 2014 you didn't hit Mecca in the face with an open hand?
> McVAY:    No, ma'am.
> STATE:    You didn't slap her?

---

[12]  Tomecca was called "Mecca."

McVAY:	Where did that come from?

STATE:	Did you slap her?

McVAY:	No ma'am. I never slapped Mecca.

STATE:	Did you bite her nipple so badly that you left marks?

McVAY:	No, ma'am.

STATE:	Did you press your elbow into her right chest choking her out?

McVAY:	No, ma'am.

STATE:	Did you have charges filed on you for domestic violence against Tomecca?

McVAY:	It was - - Tomecca did several trifling things.

STATE:	Mr. McVay?

McVAY:	Yes, ma'am. I had - - she - - yes, ma'am.

STATE:	And those charges were for domestic abuse?

McVAY:	Yes, ma'am.

STATE:	Isn't it also true . . . [t]hat there was an incident after 2014, before this in 2017, where Mecca tried to leave an event that she was at with you and you pulled a gun on her?

McVAY:	No, ma'am, that's not true.

STATE:	And you shot at her feet?

McVAY:	Hell no.

STATE:	Okay. So it is your testimony to this jury that you made threats of physical violence, like putting her jaw on the other side of her lips, but you never actually used physical violence?

McVAY:	No, ma'am.

STATE:	Never told her, "I will blow your fucking head off"?

McVAY:	No.

STATE:	So what you are asking this jury to believe is that there were occasions where you threatened her with physical violence, you just never carried out those threats?

McVAY:	No, ma'am. I made statements like I will kick her tail until her nose bleed. But as far as beating Mecca . . . no. . . .

STATE:	How many times would you say you threatened things like putting her jaw on the other side of her lips or kicking her tail until what bleeds?

McVAY:	Her nose bleeds. That putting her jaw on the other side of her lip, once. But kicking her tail until her nose bleeds, several.

STATE:	Several?

McVAY:	Yes, ma'am.

The State never offered any evidence of the 2014 charge or allegations. Inexplicably, the

15

State never took the next step to actually impeach McVay by confronting him with the police report or documents detailing the charge. McVay never objected to any of the questions asked by the State.

¶29. McVay contends that these questions "involved attempts to substantively prove factors covered by [Rule] 404(b) for which the State had offered no evidence in its case in chief." McVay added, "[T]he questions did not appear to comply with the trial court's pretrial ruling on 404(b) evidence and otherwise prejudiced McVay by unsubstantiated insinuations and innuendo." The State responds that McVay's claims of error are waived due to his failure to object at trial. Alternatively, the State claims that notwithstanding the waiver, any error would be subject to a plain error review by this Court. Further, it appears the State argues that the questioning was proper because the "trial court ruled correctly that McVay's prior instances of domestic violence against Tomecca were admissible for noncharacter purposes under Rule 404(b) and were not substantially outweighed by the danger of unfair prejudice under Rule 403." Last, the State argues that the questioning was proper under 404(a)(2)(A) because McVay "opened the door to his character."

¶30. As a threshold matter, we note that McVay never objected to any of the State's questions. McVay argues this "issue is reviewable on appeal notwithstanding the lack of objections" and cites *Tudor*, 299 So. 2d at 683 (holding that even though "[a]ppellant's counsel failed to object to some of the above matters, we have no hesitancy in finding that a combination of all of the above deprived the appellant of his due process right to a fair and impartial trial"). As this Court has previously recognized, "[q]uestions of prosecutorial

16

misconduct will not be addressed where the defendant did not raise the question at trial."
*Anderson v. State*, 154 So. 3d 42, 57 (¶47) (Miss. Ct. App. 2014) (citing *Jackson v. State*, 832 So. 2d 579, 581 (¶3) (Miss. Ct. App. 2002)). Because he failed to make any objection on this basis at trial, McVay waived his right to raise this issue on appeal. *See Simmons v. State*, 805 So. 2d 452, 489 (¶98) (Miss. 2001). "The rationale behind the contemporaneous objection rule is so that the trial court may, when possible, correct the error." *Giles v. State*, 282 So. 3d 519, 525 (¶14) (Miss. Ct. App. 2019) (citing *Jenkins v. State*, 75 So. 3d 49, 57 (¶21) (Miss. Ct. App. 2011)). Therefore, a trial judge will not be found in error on a matter not presented to him or her for decision. *Id*. (citing *Smith v. State*, 724 So. 2d 280, 319 (¶155) (Miss. 1998)). Here, McVay's failure to object to the State's questioning precludes him from challenging it on appeal.

¶31. Nevertheless, the State asks this Court to consider the issue for plain error. *See Grubb v. State*, 584 So. 2d 786, 789 (Miss.1991) (explaining plain error review allows an appellate court to address an issue not raised at trial if the record shows that error did occur and that substantive rights were violated). However, McVay does not ask this Court to conduct a plain error analysis. In fact, the phrase "plain error" is never referenced anywhere in McVay's brief. Instead, McVay relies on numerous case illustrations and attempts to equate the facts of his case with those holdings to extrapolate reversible legal error.

¶32. The plain error doctrine provides appellate courts the ability to remedy "legal errors" when a violation caused a "manifest miscarriage of justice" or the violation "seriously affects the fairness, integrity or public reputation of judicial proceedings." *Brown v. State*, 178 So.

3d 1234, 1264 (¶58) (Miss. 2015) (citing *Flora v. State*, 925 So. 2d 797, 811 (Miss. 2006));

*Giles*, 282 So. 3d at 525 (¶15) (citing *Starr v. State*, 997 So. 2d 262, 266 (¶12) (Miss. Ct.

App. 2008)). Additionally, "[p]lain-error review is properly utilized for 'correcting *obvious*

instances of injustice or misapplied law.'" *Bowdry v. State*, 158 So. 3d 354, 356 (¶6) (Miss.

Ct. App. 2014) (emphasis added) (quoting *Smith v. State*, 986 So. 2d 290, 294 (¶10) (Miss.

2008)). Therefore, to "determine if plain error has occurred, we must determine if the trial

court has deviated from a legal rule" and "whether that error is plain, clear, or obvious."

*Green v. State*, 183 So. 3d 28, 31 (¶6) (Miss. 2016) (citing *Neal v. State*, 15 So. 3d 388, 403

(¶32) (Miss. 2009)); *see also Adams v. State*, 350 So. 3d 1116, 1124 (¶21) (Miss. Ct. App.

2022), *cert. denied*, 350 So. 3d 235 (Miss. 2022). Last, we consider "whether that error has

prejudiced the outcome of the trial." *Swinney v. State*, 241 So. 3d 599, 606 (¶15) (Miss.

2018) (citing *Conner v. State*, 138 So. 3d 143, 151 (¶19) (Miss. 2014)). "Prejudice often is

lacking when the weight of the evidence against a defendant is overwhelming." *Id*. (citing

*Hall v. State*, 201 So. 3d 424, 428 (¶12) (Miss. 2016)).

¶33.     In a unique twist to the consideration of plain error in this case, McVay never cites

any authority or provides any meaningful argument whether plain error applies. McVay

never explains how the one issue he raises in this case could be plain error. Mississippi Rule

of Appellate Procedure 28(a)(7) requires appellants to include "argument . . . [on] the

contentions of appellant with respect to the issues presented, and the reasons for those

contentions, with citations to the authorities, statutes, and parts of the record relied on."

*Reading v. Reading*, 350 So. 3d 1195, 1199 (¶19) (Miss. Ct. App. 2022) (citing *Walker v.*

18

*State*, 197 So. 3d 914, 919 (¶25) (Miss. Ct. App. 2016)). The rule "does not simply require a party to mention authority; the authority must be used to **develop the argument in a meaningful way**." *Walker*, 197 So. 3d at 919 (¶25) (emphasis added) (quoting *Archer v. State*, 118 So. 3d 612, 621 (¶29) (Miss. Ct. App. 2012)). Mississippi courts have repeatedly held that "in the absence of meaningful argument and citation of authority, [we] generally will not consider the assignment of error." *State v. Aldrich*, No. 2022-SA-01088-SCT, 2024 WL 1455595, at *6 (¶31) (Miss. Apr. 4, 2024) (citing *Patton v. State*, 109 So. 3d 66, 75 (Miss. 2012)); *Stewart v. State*, 291 So. 3d 738, 749 (¶47) (Miss. 2020)*; Randolph v. State*, 852 So. 2d 547, 558 (¶29) (Miss. 2002)); *Goode v. State*, 374 So. 3d 592, 603 n.5; *Gilbert v. State*, 379 So. 3d 890, 898 (¶13) (Miss. Ct. App. 2023); *Siggers v. State*, 342 So. 3d 1213, 1218 (¶16) (Miss. Ct. App. 2022). The Supreme Court has held that issues not supported by "meaningful argument" for appellate review, are waived. *Aldrich*, 2022-SA-01088-SCT, at *5 (¶31) (citing *Hale v. State*, 191 So. 3d 719, 724 n.1 (Miss. 2016) (citing *Grey v. Grey*, 638 So. 2d 488, 491 (Miss. 1994))).

¶34.    Here, McVay fails to point to any obvious or clear legal rule he claims was violated because he fails to address plain error at all. Instead, this Court would have to surmise, develop, and research the exact nature of the alleged prosecutorial misconduct, which is not our role. *Satterfield v. State*, 158 So. 3d 380, 383 (¶6) (Miss. Ct. App. 2015) (citing *Jefferson v. State*, 138 So. 3d 263, 265 (¶9) (Miss. Ct. App. 2014)) ("Simply put, we will not act as an advocate for one party to an appeal. The appellant must affirmatively demonstrate error in the court below, and failure to do so waives an issue on appeal."). The United States

19

Supreme Court has held, and we have repeated, "In our adversary system, it is enough for judges to judge. The determination of what may be useful to the defense can properly and effectively be made **only by an advocate**." *Davis v. State*, 347 So. 3d 1205, 1216 (¶25) (Miss. Ct. App. 2022) (emphasis added) (quoting *Dennis v. United States*, 384 U.S. 855, 875 (1966)). In *Davis v. State*, 347 So. 3d 1205, 1214-15 (¶21) (Miss. Ct. App. 2022), this Court held that the trial court did not err by failing to sua sponte "correct" a defendant's proposed jury instruction when the defendant did not advance such argument on appeal. We stated the following:

> The Code of Judicial Conduct mandates an independent and impartial judiciary. *See* Miss. Code Jud. Conduct Canons 1, 3(E)(1). In fact, the Code of Judicial Conduct uses the word "impartial" twenty-six times. "An independent and honorable judiciary is indispensable to justice in our society." *Id.* "A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." Miss. Code Jud. Conduct Canon 2(A). "A judge shall perform the duties of judicial office impartially and diligently." *Id.* "A judge shall perform judicial duties without bias or prejudice." Miss. Code Jud. Conduct Canon 3(B)(5). "A judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice." *Id.* How can a judge comply with these canons and sua sponte give jury instructions as to potential defense strategy? Parties to litigation would lose confidence in the independence of the courts if a judge tells an attorney for one side what jury instructions should be submitted to provide new theories of defense.

*Davis*, 347 So. 3d at 1215-16 (¶21). A similar question should be asked here. How can appellate courts comply with these canons and yet have to decide if and how a particular rule may have been violated under plain error on behalf of an appellant when the appellant has not advanced any of those arguments or theories to the court on appeal?

¶35. The Supreme Court has instructed that errors impacting a defendant's fundamental

20

rights are required to be addressed by this Court on plain error review. *See Stevenson v. State*, 320 So. 3d 1225, 1229 (¶12) (Miss. 2021) (citing *Cozart v. State,* 226 So. 3d 574, 581 (¶22) (Miss. 2017)). The plain error doctrine applies when "an error exists and that error caused a manifest miscarriage of justice." *Brown*, 178 So. 3d at 1264 (¶58). However, this Court has found no case where an appellant makes no objection at trial, makes no motion for a mistrial, makes no motion for any post-trial relief, fails to cite any authority applying plain error, and provides no argument to an appellate court, much less any meaningful argument on this issue, yet this Court still considered the issue. Such a path blurs the lines of clearly defined roles in our judicial system. McVay provides no argument as to what "legal rule" was violated under the test of plain error. Therefore, this Court would be forced to surmise and assume the role of an advocate to develop an argument in McVay's behalf. This Court declines to engage in such an adversarial role on behalf of the appellant.

¶36.    This Court is firmly convinced that not only have McVay's arguments been waived by his failure to object at trial, but the issue as to plain error review is also waived because McVay failed to cite any authority or provide any meaningful argument on appeal as to plain error, which is not some unknown legal concept. It has graced our appellate jurisprudence for many years. It is the legal avenue of correcting serious, substantive, and obvious legal wrongs that were not preserved for appeal by a trial-level objection. In *Carlisle v. State*, 936 So. 2d 415, 422 (¶23) (Miss. Ct. App. 2006), this Court held a defendant's argument was "procedurally barred" even as to plain error partly because he "failed to . . . make an argument to this [C]ourt under the plain error doctrine" and failed to make the argument in

21

his brief to this Court. In that case, the defendant was convicted of possession of over one ounce of marijuana with intent to sell. *Id*. at 417 (¶1). The defendant appealed arguing that the trial court committed reversible error by failing to administer the petit jury oath to the jury and that this "resulted in a violation of his fundamental right to a fair trial." *Id*. at 421 (¶21). We held that the defendant was "procedurally barred from raising this issue on appeal because he failed to make a contemporaneous objection at trial, did not raise this issue in his motion for a new trial, or make an argument to this [C]ourt under the plain error doctrine." *Id.* at 422 (¶23). However, "[n]otwithstanding the procedural bar," we proceeded to discuss the defendant's claim under plain error review and held that it was "without merit" because the defendant's argument was legally incorrect. *Id.* at (¶¶23-24). We find the issue as to plain error is waived because McVay failed to cite authority or provide meaningful argument in his brief to this Court concerning that issue. However, in an abundance of caution, since the Supreme Court has not yet held that plain error can be waived where an appellant does not cite authority nor provide meaningful argument on the issue, we will address McVay's issue in this appeal under plain error review.

¶37.     Notwithstanding the waiver or bar, and despite McVay making no argument on this point, we consider whether a legal rule was violated rising to the level of plain error.[13] So, what potential legal rule was violated when the State asked the questions McVay complains about on appeal? The State offers legal justification for the questions asked during McVay's

---

[13] *See Ross v. State*, 275 So. 3d 1090, 1094 (¶12) (Miss. 2019) (citing M.R.A.P. 28(a)(3)) ("[T]he [C]ourt *may*, at its option, notice a plain error not identified or distinctly specified." (emphasis added)).

cross-examination which this court will use as a guide in answering this question. First, the information within the questions asked by the State certainly did not violate Mississippi Rule of Evidence 404(a)(2)(A) since McVay offered his character for peacefulness to the jury by testifying that his arguments with Tomecca never got "physical."[14] *See Brown v. State*, 483 So. 2d 328, 330 (Miss. 1986)). In addition, the information discussed based on the State's questions did not violate Mississippi Rule of Evidence 404(b), as the trial court clearly ruled the allegations of prior domestic violence were admissible as exceptions under rule 404 and then, applying Rule 403, found the probative value of evidence as to McVay's motive and intent was not substantially outweighed by the danger of its prejudicial effect. *See Moffett v. State*, 938 So. 2d 321, 328 (¶25) (Miss. Ct. App. 2006) (citing *Flowers v. State*, 773 So. 2d 309, 326 (¶58) (Miss. 2000)). Finally, McVay's claim that the State improperly impeached him by asking him questions without a factual basis is simply not true. The State had a pre-trial hearing where that exact information was ruled admissible by the trial court, and the reports and information from the 2014 domestic violence arrest were attached to the State's motion and clearly set forth in those documents. There is simply no "legal rule" that was obviously or clearly violated. *Green*, 183 So. 3d at 31 (¶6). Further, McVay failed to show that the State's questioning caused prejudice resulting in a "manifest miscarriage of justice." *Smith*, 986 So. 2d at 294 (¶10). We find no plain error.

¶38. In an effort to have this Court reverse his conviction, McVay does cite several cases: *Tudor v. State*, 299 So. 2d 682, 685 (Miss. 1974); *Smith v. State*, 457 So. 2d 327 (Miss.

---

[14] "[A] defendant may offer evidence of the defendant's pertinent trait, and if the evidence is admitted, the prosecutor may offer evidence to rebut it[.]"

23

1984); *Hosford v. State*, 525 So. 2d 789, 791 (Miss. 1988); and *Walker v. State*, 740 So. 2d 873, 884 (Miss. 1999).

¶39.   In *Tudor*, 299 So. 2d at 683, the Supreme Court held that even where "[a]ppellant's counsel failed to object," a combination of errors "deprived the appellant of his due process right to a fair and impartial trial." In *Tudor*, the defendant was charged with the sale of marijuana. *Id*. At trial, testimony was admitted which alluded to the defendant's sale of other unrelated drugs *Id.* at 684-85. Further, during the defendant's cross-examination, the district attorney questioned the defendant as to whether he was smoking, buying, or selling marijuana at the home of another individual. *Id*. at 685. Later, the State asked the defendant about his termination from his job. *Id*. Various other hearsay statements were injected into trial testimony as well. *Id*. The defendant's counsel "failed to object to some of the above matters, objected to others with the objection being sustained, and in some instances, the court instructed the jury to disregard the testimony. In other instances, the objection was overruled and the evidence admitted." *Id*. The defendant was convicted and he appealed arguing the State's questions denied him a right to a fair trial. *Id*. On appeal, the Supreme Court considered that "[s]ome of the errors were more serious than others and although some of them may not alone constitute reversible error, we have no hesitancy in finding that a combination of all of the above deprived the [defendant] of his due process right to a fair and impartial trial." *Id*. Accordingly, the Supreme Court found that the injection of this "irrelevant, inflammatory and prejudicial" evidence "denied [defendant] his right to a fair and impartial trial." *Id*. at 686.

24

¶40.   *Tudor* is distinguishable from the instant case.  First, *Tudor* was decided prior to the promulgation of the Mississippi Rules of Evidence.  Although in *Tudor*, an accumulation of multiple irrelevant and inflammatory prior bad acts, considered together, constituted prejudice against the defendant, the same cannot be said for McVay.  In McVay's case, the only information referenced in the State's cross-examination was that which the trial court had previously decided was relevant and would be admissible in its granting of the State's motion in limine.  McVay admitted he was in fact charged with domestic violence against Tomecca in 2014.  The trial court held that evidence was admissible under Rule 404(b) as to motive and intent.  McVay denied the specific allegations contained within the State's questions.  The questions asked in this case are vastly different from the action of the State in *Tudor*.

¶41.   Further, McVay relies on *Smith*, 457 So. 2d at 336, for his argument that a "tactic of accusation through questioning" subjects a defendant "to such irrelevant, inflammatory and prejudicial evidence as to deny [defendant] his right to a fair and impartial trial."  In *Smith*, the State attempted multiple times at trial to impeach the credibility of defense witnesses with questions that amounted to "sneers and innuendo."  *Id*. at 334.  Specifically, the prosecutor asked a key defense witness if "she was selling her body in Jackson like she did on the coast."  *Id*.  The prosecutor did not have any proof on which it based this question.  *Id.*  The prosecutor also repeatedly violated directives from the court as to particular lines of impeachment questioning.  *Id.* at 335.  The defendant failed to object to some of the instances of prosecutorial misconduct, but the Supreme Court held that the cumulative effect of all of

25

the instances had rendered Smith's trial fundamentally unfair. *Id.* at 336.

¶42. McVay's case is factually distinct from *Smith*. In *Smith*, the prosecutor's errors were mere "sneers and innuendo" and flagrant deviations from the trial court's orders; whereas the questions asked in McVay's case were in an attempt to impeach his prior testimony that he was never physically violent with Tomecca, although the State never completed the impeachment. Further, the prosecutor in *Smith* had no factual basis or evidence for its questions, whereas the prosecutor in McVay's case had a good faith basis for its questions on cross-examination. *See Moffett*, 938 So. 2d at 328 (¶¶25-26) ("Counsel must have a good faith basis for questions asked on cross-examination."). The information was the subject of the pre-trial hearing, the police report and charging documents clearly contained the information asked by the State and McVay was fully aware of the information as he attended the hearing where the information was discussed.

¶43. Further, McVay cites *Hosford* for the "general rule" that the "State was obligated to present all relevant evidence bearing upon [defendant]'s guilt as part of its case in chief, not initially through cross-examination of the defendant and his witnesses . . . ." *Hosford*, 525 So. 2d at 791. McVay claims that in his case, "the State engaged in the same reversible tactics as in *Hosford*" because he "was asked questions about prior abuse including shooting at Tomecca when the State had presented no evidence upon which to base the questions." He further claims this prejudiced him by giving a "false impression to the jury that the State had proof of the events inquired about."

¶44. In *Hosford*, the defendant was on trial for sexual battery of a child. *Id.* at 789. During

26

cross-examination, over the defendant's objection, the State asked the defendant if he had sexually abused other individuals and proceeded to list other individuals one by one. *Id.* at 791. On appeal, the Supreme Court pointed out that "[t]he State . . . made no effort during the presentation of its case in chief to present evidence of [defendant]'s violence toward his own family, or acts of sexual, deviant conduct with his stepchildren." *Id.* The Supreme Court noted that "the State was obligated to present all relevant evidence bearing upon [the defendant]'s guilt as part of its case in chief, not initially through cross-examination of the defendant and his witnesses, and then offering evidence of such conduct in rebuttal." *Id.* The Supreme Court then quoted *Roney v. State*, 167 Miss. 827, 150 So. 774 (1933), where it held:

> [I]t is the general rule in this state, as elsewhere, that the party who has the burden of proof, and the duty to open the case, must in his opening, and before he rests in his proof, introduce all the substantive evidence upon which he relies to establish his demand, and the extent of that demand. . . .

*Id.* at 791.

¶45. The Supreme Court held that the State's "error was egregiously compounded by the fact that the State . . . had no evidentiary basis to ask such questions[,]" and "before the State asks questions to the accused directed to whether he is guilty of a series of totally different crimes, it [must] have some basis in fact to ask them." *Id.* at 792 (citing *Roney*, 150 So. at 774). Accordingly, the Supreme Court held that the State's line of questioning constituted reversible error. *Id.*[15]

---

[15] *Hosford* was published in 1988, long before the decision in *Derouen v. State*, 994 So. 2d 748, 756 (¶19) (Miss. 2008) (holding that prior victim evidence, "if properly admitted under Rule 404(b), filtered through Rule 403, and accompanied by an appropriately-drafted limiting or cautionary instruction to the jury, should not be considered per se error").

¶46. McVay's case is factually distinct from *Hosford*. Again, the trial court had already made a determination that the evidence regarding McVay's prior threats and allegations of domestic violence were relevant and admissible. In other words, the evidence had previously been "tested" outside the presence of the jury and determined competent under Rule 404(b), which addressed the concerns expressed in *Hosford*.

¶47. Finally, McVay argues *Walker v. State*, 740 So. 2d 873, 886 (¶51) (Miss. 1999), requires this Court to reverse his conviction. In *Walker*, the Supreme Court held that "it is prejudicial error for questions on cross-examination to contain insinuations and intimations of such conduct when there is no basis in fact." (citing *Hosford*, 525 So. 2d at 793). In *Walker*, a defendant was charged with capital murder. *Walker*, 740 So. 2d at 877 (¶1). At trial, the defendant was asked whether he had ever made a number of death threats, which he denied. *Id.* at 883 (¶39). On cross-examination, the defendant was questioned extensively regarding said threats as well as gang signs that he allegedly marked into his cell wall. *Id*. He made no objections to this questioning. *Id*. At his sentencing hearing, which would determine whether the defendant received the death penalty, a witness was brought in to testify as to the defendant's threats and gang affiliation. *Id*. No rebuttal testimony was offered to show that Walker had made such threats or that he was a member of a gang until the sentencing phase of the trial. *Id*. at 884 (¶40). The State also failed to show the relevance of such questioning. *Id*. The defendant was convicted of murder and sentenced to death. *Id*. at 877 (¶1). On appeal, the Supreme Court held that "the admission of the above-mentioned testimony injected an impermissible factor into the sentencing process" and

remanded the case for a new sentencing hearing.

¶48. This case is factually distinct from *Walker*. First, as stated, the evidence in this case was already deemed admissible pursuant to the State's pre-trial motion in limine. Accordingly, it cannot be said that the State interjected irrelevant, prejudicial evidence as was the case in *Walker*. Second, the line of questioning in Mcvay's case did not occur during sentencing but, in fact, occurred during the State's cross-examination of McVay after he opened the door to his character by claiming he was never physically violent with Tomecca.

¶49. The cases on which McVay relies are not on point and do not legally support reversing his conviction. Also, looking at those cases through the lens of plain error, we find there was no "plain, clear, or obvious" error warranting reversal. *Adams*, 350 So. 3d at 1124 (¶21). Further, McVay failed to show that the State's cross-examination of him resulted in the kind of prejudice involved in the cases on which he relies. In other words, McVay failed to show that the State's questioning "caused a manifest miscarriage of justice" and affected his "substantive or fundamental rights." *See Brown*, 178 So. 3d at 1264 (¶58).

¶50. Alternatively, if there was error by the State, the error was harmless. An error is harmless when it is apparent on the face of the record that a fair-minded jury could have arrived at no verdict other than that of guilty. *Floyd v. City of Crystal Springs*, 749 So. 2d 110, 120 (¶37) (Miss. 1999) (citing *Forrest v. State*, 335 So. 2d 900, 903 (Miss. 1976)). The Supreme Court of Mississippi has held that "[w]here the prejudice from an erroneous admission of evidence dims in comparison to other overwhelming evidence, this Court has refused to reverse." *McKee v. State*, 791 So. 2d 804, 810 (¶24) (Miss. 2001). Here, there is

29

an abundance of evidence of McVay's guilt, namely his own typed statement in which he confessed to all four murders. This statement included specific details regarding the murders that had not been previously explained to McVay. McVay signed the statement and even had his fingerprint affixed to the confession. Additionally, McVay described exactly where he had hidden the 9-millimeter pistol, which guided law enforcement to its retrieval. Expert testimony indicated that the 9-millimeter pistol was the weapon used to commit three of the four murders. Further, McVay repeatedly admitted to fighting with Tomecca at her place of employment on the day of the murders. McVay also admitted to being at the crime scene twice on the day of the murders, where a second argument ensued. In McVay's case, the evidence was so overwhelming that no fair-minded jury could have arrived at a verdict other than that of guilty, and therefore, even if allowance of the cross-examination questions was error, such error was harmless. *Floyd*, 749 So. 2d at 120 (¶37).

## II. Ineffective Assistance of Counsel

¶51. McVay argues his attorney was ineffective because he failed to object to the State's line of questioning about the 2014 prior domestic violence against Tomecca and that this rendered his trial constitutionally unfair. McVay asserts the record on appeal is sufficient for this Court to address this issue. The State does not address the sufficiency of the record and contributes only one sentence in its brief as to this issue.

¶52. "Generally, ineffective-assistance-of-counsel claims are more appropriately brought during post-conviction proceedings." *Ross v. State*, 288 So. 3d 317, 324 (¶29) (Miss. 2020) (internal quotation marks omitted) (quoting *Bell v. State*, 202 So. 3d 1239, 1242 (¶12) (Miss.

30

2016)). But this Court will "resolve[] ineffective-assistance-of-counsel claims on direct appeal when the record affirmatively shows that the claims are without merit." *Id*. (citing *Swinney*, 241 So. 3d at 613 (¶58); *Ashford v. State*, 233 So. 3d 765, 779-81 (¶¶50-56) (Miss. 2017); M.R.A.P. 22).

¶53.    "A claim for ineffective assistance of counsel must meet the two-prong test outlined in *Strickland v. Washington*, 466 U.S. 668, 686 (1984)." *Harrell v. State*, 947 So. 2d 309, 313 (¶10) (Miss. 2007) (citing *Bennett v. State*, 933 So. 2d 930, 943 (¶35) (Miss. 2006); *Sipp v. State*, 936 So. 2d 326, 334 (¶21) (Miss. 2006); *Byrom v. State*, 927 So. 2d 709, 714 (¶6) (Miss. 2006)). "The defendant must demonstrate [(1)] that his counsel's performance was deficient, and [(2)] that the deficiency prejudiced the defense of the case." *Id.* (quoting *Ransom v. State*, 919 So. 2d 887, 889 (¶12) (Miss. 2005)). "To determine the second prong[,] the standard is 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id*. (quoting *Ransom*, 919 So. 2d at 890 (¶12)).

¶54.    However, we will also note that "[i]n considering a claim of ineffective assistance of counsel, an appellate court must strongly presume that counsel's conduct falls within a wide range of reasonable professional assistance, and the challenged act or omission might be considered sound trial strategy." *Liddell v. State*, 7 So. 3d 217, 219 (¶6) (Miss. 2009) (internal quotation marks omitted) (quoting *Bennett v. State*, 990 So. 2d 155, 158 (¶9) (Miss. 2008)). Accordingly, "[t]he decision to object to a particular question . . . falls within the discretion of planning and developing a trial strategy." *Bennett*, 933 So. 2d at 943 (¶36)

(citing *Cole v. State*, 666 So. 2d 767, 777 (Miss. 1995)); *see also Berry v. State*, 882 So. 2d 157, 163 (¶20) (Miss. 2004) (holding "counsel's choice whether to make certain objections falls within the ambit of trial strategy and cannot give rise to an ineffective assistance of counsel claim"). There is nothing to suggest that defense counsel's failure to object was anything except trial strategy.

¶55.    McVay fails to show how his attorney's failure to object prejudiced him or would have changed the outcome of his case. In fact, during redirect examination, his attorney made a point to the jury about the very questions McVay complains about:

| | |
|---|---|
| DEFENSE COUNSEL: | And you have never been convicted of a domestic charge, correct? |
| McVAY: | No sir. |

There is nothing in the record that would prove or even support his argument that his attorney's performance was deficient for not objecting to questions the court had already deemed admissible in a pretrial hearing. Further, the record includes McVay's own statement confessing to all four murders, a statement that contained a detailed and accurate account of how each of the murders was carried out. Furthermore, McVay's confession directly led to the police locating the gun McVay claimed he used, and expert testimony indicated it was the weapon used in three of the four murders. Additionally, McVay admitted in his sworn testimony that he had threatened Tomecca numerous times until the day before her murder. He further admitted to being at her home and at the scene of the crime, and even getting into an argument with her on the night in question. McVay wants this Court to believe that a few questions asked by the State without objection from his attorney prejudiced

him more than his own confession to killing four victims. The evidence amassed against McVay was overwhelming. His attorney's failure to object easily could have been trial strategy. *Berry*, 882 So. 2d at 163 (¶20). There is nothing in the record that proves his attorney's failure to object caused McVay actual prejudice. In summary, McVay failed to prove deficient performance or prejudice. This issue is without merit.

## CONCLUSION

¶56. McVay's claims are waived on appeal for his failure to object to the State's cross-examination at trial. Further, his claims are waived because he did not make meaningful arguments or cite authority as to the issue of plain error in his brief. Nonetheless, we hold that the trial court did not commit plain error in allowing the State to cross-examine McVay concerning his prior allegations of domestic violence. Further, McVay's counsel was not ineffective for failing to object. Finding no abuse of discretion on the part of the trial court, we affirm.

¶57. **AFFIRMED.**

**BARNES, C.J., GREENLEE, McDONALD, McCARTY, SMITH AND EMFINGER, JJ., CONCUR. WILSON, P.J., AND WESTBROOKS, J., CONCUR IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. CARLTON, P.J., NOT PARTICIPATING.**